**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Andrew Yang, Jonathan Herzog, Hellen Suh, Brian Vogel, Shlomo Small, Alison Hwang, Kristen Medeiros and Dr. Roger Green, individually and on behalf of all others similarly situated,<br><br>      **Plaintiffs,**<br><br>  v.<br><br>New York State Board of Elections,<br><br>      **Defendant.** | **ECF CASE**<br><br>CIVIL ACTION: 33-cv-3325 (AT)<br><br><br>FIRST AMENDED<br>EMERGENCY COMPLAINT SEEKING<br>RELIEF UNDER FRCP 65(B) |

**MEMORADUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY APPLICATION TO INVALIDATE NEW YORK ELECTION LAW § 2-122-a (13) AND REINSTATE THE NEW YORK DEMOCRATIC PARTY PRESIDENTIAL PRIMARY ON JUNE 23, 2020**

Jeffrey M. Kurzon
Leonard M. Kohen

Kurzon Kohen LLP
*Attorneys for Plaintiffs*
305 Broadway, Fl 7,
New York, N.Y. 10007
Office/Fax. 212.203.8918
www.Kurzon.com

## TABLE OF CONTENTS

**Preliminary Statement**………………………………………………………………...3

**Introduction**………………………………………………………………………………4

**Jursisdiction and Venue** ……………………………………………………………...5-6

**Facts**………………………………………………………………………………6-8

**Argument**………………………………………………………………………...8-18

**11th Amendment**.......................................................................................................18-23

**Conclusion**………………………………………………………………………...23-24

## PRELIMINARY STATEMENT

Plaintiffs, Andrew Yang, who was a candidate for U.S. president in the primary election of the Democratic Party, and the other individuals, who were anticipated delegates to the national convention, brought this action seeking, by this motion, emergency relief to reinstate the Primary Election for New York State on June 23 and invalidating the underlying new "law" that came into being on April 3, through which the defendants, *viz.* State Board of Elections, claim entitles them to cancel the New York Presidential Primary Election.

## **INTRODUCTION**

### The Parties to this Action

i.       Plaintiffs

There are eight plaintiffs to this Action (First Amended Complaint, ECF Dkt. No. -- , pp. 8-40) with additional plaintiffs still possible; this action impacts the more than six million Democratic Party voters in New York State. This action presents national implications up to and including that will affect the outcome of the Democratic Party national convention this August in Milwaukee (FAC pp. 58, 70). Each of the Plaintiffs are United States citizens (FAC p. 8) and residents of New York. The lead plaintiff, Andrew Yang ("Yang") ran for President of the United States for more than two years ending this past February 11 (*see* FAC p. 10) and the other seven Plaintiffs are running to be delegates at the Democratic National Convention (FAC pp. 15, 19, 23, 27, 31, 35 and 39).

Plaintiffs, although candidates, are also voters in the Democratic Party, registered in New York (FAC 11, 14, 18, 22, 26, 30, 34 and 38). The Plaintiffs are not only taking this action to assert their rights, they also act herein on behalf of all voters who are similarly impacted by being denied the right to vote by the Defendant (FAC 5, 6, 47, 67, 68 and 85).

Counsel to Plaintiffs have styled this action in the caption and pleadings as attorneys to all other similarly situated, as it is the undersigned's belief that Defendant's have violated Plaintiff's constitutional rights and those of more than six million registered Democratic Party voters in the State of New York, but taking official State action that indirectly strips away the rights all Democratic Party voters in our nation.

     ii.    <u>Defendant and Additional Anticipated Defendants</u>

Defendant New York State Board of Elections is an agency of the New York State government with the duty to uphold the State's election laws (FAC 41) The Defendant "does business" and transacts its operations within this Court's jurisdiction (FAC 42) and one if its Democratic Party's Commissioners, Douglas Kellner ("Kellner"), also an anticipated defendant, has appeared already in this action (FAC 42, ECF Dkt. No. 4). This Court granted Plaintiffs' letter motion seeking leave to amend the First Amended Complaint, which they must do before noon tomorrow, May 1, whereby Plaintiffs will add additional defendants in this action (*see* ECF Dkt. 10), *See* Order, ECF Dkt. No. 11. Plaintiffs will also add additional defendants to ensure complete subject matter jurisdiction by this Court.

     iii.    <u>Intervenors</u>

ECF Dkt. No. 12 is an attempted appearance by attorney counsel Penny Mintz. Because of the strict filing deadline of this memo of law, counsel for Plaintiffs has not yet had time to consider potential intervenors. Generally and notwithstanding Plaintiffs' rights, counsel submits the more voices that are heard the better to protect our democracy and right to vote.

## **<u>JURISDICTION AND VENUE</u>**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), §1343 (a) (3) (equal rights) and § 1343(a) (3) (right to vote). Federal questions of law herein pertain *inter alia* to the First and Fourteenth Amendments to the U.S. Constitution that thereby belong in Federal court. (FAC 44, 47). Venue is appropriate in this Court because

Defendants transact and do business in this District [U.S. Southern District of New York] and the acts complained of occurred in this District (FAC pp. 45-46).

As the State has denied Plaintiffs their constitutionally guaranteed federal constitutional and other  civil rights, this Court is the best forum for resolving these disputes. (FAC p. 47).

The 11th Amendment (discussed *infra. See P. 18)* to the Constitution states:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

The Eleventh Amendment to the U.S. Constitution is not a bar to this suit because the Plaintiffs are solely residents/voters/citizens of New York, it would unconscionable if Citizens of the United States were unable to redress harm by the States in Federal Court (see, e.g., *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954)) (FAC p. 48). As the *Ex Parte Young* doctrine 209 U.S. 123 (1908) seems to apply (discussed *infra)*, Plaintiffs have obtained leave to amend their complaint, which they will do so as to preserve the summary judgment matter jurisdiction of this Court.

## **FACTS**

The Defendant purports to justify the actions that it took underlying this lawsuit, i.e.,  in cancelling the Democratic Presidential Primary election in New York, upon the COVID-19 crisis. (FAC P. 49-53). The Democratic Presidential primary election was originally scheduled for April 28, 2020 (FAC P. 54), but was delayed because of COVID-19 to coincide with the previously planned Federal, State and local elections to occur on June 23, 2020 (FAC P. 3, 4, 6 and 61 et. seq.).

Plaintiffs met the requirements for the April 28, 2020 (rescheduled to June 23, 2020) election by complying with the New York Election Law. (FAC 56, FAC Exs. No. A-H). Hundreds of other would-be delegate candidates did the same (see e.g FAC exs. I and K).

Despite performing the exhaustive work of gathering signatures this past January and February, Defendant never afforded the Plaintiffs procedural or substantive due process, namely that a yet-to-be enacted law would subject them their complete  omission from the ballot, action that the Defendant undertook pursuant to a resolution that Defendant passed on April 27, 2020 (the "Resolution"). *See* ECF Dkt. No. 4, pp 3-4); *see also* ECF Dkt. Nos. -- - ---, FAC Exs. No. A-H where Plaintiffs document their arduous work to achieve ballot in New York State.

Defendants have argued in the news they did this because of the COVID-19 pandemic and that Plaintiffs suspended their campaigns, but Plaintiff Yang nor the other Plaintiffs actually terminated their campaigns (see FAC Ex. A, Yang Aff. ,p. 5 "This suspension was not a termination" [*see also* id., p. 6]: "By suspending my campaigning and ceasing to raise funds for my committee, I ...believed and expected that my name would … stay on the ballot in states with upcoming elections as my campaign had met the legal requirements and it was my intention and hope that voters would express their preference by voting in the upcoming elections.".

Defendants acted pursuant to an unconstitutional law (under both New York State and U.S.  Constitutions) that the State Legislature passed in an omnibus spending bill signed by the Governor of New York on April 3, 2020 that amended the New York election law to include the *ex post facto* law, New York Election Law. §2-122-A(13); it was *ex post facto*  because it originated only after the Plaintiffs, and all others similarly situated, took substantial efforts to obtain access to the ballot. Regrettably the defendants took these sinister actions, invoking the

specter of a concealed closed-door "three-men-in-a-room," through which they denied Plaintiffs

their right to vote and other important rights such as procedural due process guaranteed by the

U.S. Constitution. Plaintiffs were never offered any opportunity to be heard before the removal

of their names from the ballot, giving rise to their contentions herein that their rights-- and the

rights of up to more than six million residents of New York -- were being violated. *See* FAC,

Plaintiff's Exs. A-H, pp. 7-8 et. seq.).

## ARGUMENT

## NEW VOTING LAW THAT CANCELS PRESIDENTIAL PRIMARY BY OMITTING ALL CANDIDATES BUT ONE FROM BALLOT IS NOT NEUTRAL AND IS NOT CONSTITUTIONAL BECAUSE CANNOT SURVIVE "STRICT SCRUTINY"

    *A.*    The 14th Amendment and *Burdick*

The Fourteenth Amendment guarantee of "equal protection under the laws" protects voting

and safeguards the fair neutral administering of elections by the states. *Common Cause/New York*

*v Brehm*, 2020 U.S. Dist. LEXIS 4911, *69; 2020 WL 122589; No. 17-CV-6770 (AJN)

(S.D.N.Y. Jan. 10, 2020) (citing U.S. Constitution Fourteenth Amendment and *Reynold v.*

*Simms*, 377 U.S. 533, 561-562 (1974)).  "It is beyond cavil that 'voting is of the most

fundamental significance under our constitutional structure.'" *Burdick v Takushi*, 504 U.S. 428,

433 (1992); any undue burdens upon the right to vote implicate the First and Fourteenth

Amendments. *Id.*

8

The States' power to freely regulate their own elections is most commonly associated with "Time, Place and Manner" regulations for holding elections.[1] *See Burdick*, 504 U.S. at 433 (citing U.S. Constitution art. I, sec. 4). On the other hand, the right of individuals to vote is the foundation from which all other rights flow[2]:  "Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds*, 377 U.S. at 562.  A right to vote that a plaintiff "seeks to vindicate" as constitutional under the Fourteenth Amendment depends on the severity of the restriction of such right; one key measure of "reasonableness" of the restriction considers whether such restriction on voting is neutral nondiscriminatory restrictions. Here the new "law" that the Defendant purports to follow is patently discriminatory and non-neutral as it applies to some candidates and not others as it only protects the right of the  "presumptive" presidential nominee [former U.S. Vice-President Joseph Biden] to be on the ballot but singularly and alone, which is patently unreasonable and unconstitutional.  N.Y. Election Law §2-122-A(13) is vague, ill-defined (*see* FAC p. 83) and constitutes an *ex post facto* law (F.A.C. p. 82), and violates Plaintiff's rights,

---

[1] Notwithstanding that it is the prerogative of Congress to oversee the conduct of presidential and vice-presidential elections and to set the qualifications for voters for electors for those offices, *Oregon v. Mitchell*, 100 U.S. 112, 124 (1970), each State has the power to prescribe the qualifications of its officers [including delegates chosen by State parties] and the manner in which they shall be chosen. *Sugarman v Dougall*, 413 U.S. 634, 647 (1973). There is "no question" that the U.S. Constitution, Article 2, Sec. 1, which provides that "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors . . ." to choose a President and Vice President, "grants extensive power to the States to pass laws regulating the selection of electors." *William v. Rhodes*, 393 U.S. 23, 29 (1968).  Power inheres in the State by virtue of its obligation "to preserve the basic conception of a political community." *Sugarman*, 413 U.S. at 647.

[2] See *Common Cause/New York*, 2020 U.S. Dist. Lexis 4911, *69.  As the U.S. Supreme Court in *Dunn v. Blumstein* instructively summarized its conclusion upon review of the prior case law, "There is no need to repeat now the labors undertaken in earlier cases to analyze this right to vote and to explain in detail the judicial role in reviewing state statutes that selectively distribute the franchise. In decision after decision, this Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." 405 U.S. 330, 336 (1972) (collecting cases citing *inter alia Reynold v. Simms*, 377 U.S. 533 (1974) and *Kramer v. Union Free School District*, 395 U.S. 621 (1969)).

particularly *inter alia* their constitutional rights  to equal protection. FAC 90, 106; *see* U.S. and N.Y. Constitutions, Fourteenth  Amendments, and 42 U.S.C. § 1983.

In *Burdick,* the U.S Supreme Court examined a claimed right to vote and  even weighed the "voting right" based on how a plaintiff him or herself valued the right: the *Berdick* plaintiff was claiming his right to vote included the right to write-in Donald Duck as a protest vote. *Berdick*, 504 U.S. at 438. That Court consequently determined that the state had legitimate interest in the two-stage primary/general election process of winnowing out candidates; the prohibition there against write-in voting was a legitimate means of averting sore-loser candidacies. Id.

Statutes affecting constitutional rights must be drawn with "precision," and must be "tailored" to serve their legitimate objectives.  *Dunn v Blumstein*, 405 U.S. 330, 333 (1972) . In the present action, if the Defendant keeps the "presumptive" nominee on the June 23 ballot for the New York presidential primary, and conducts "down-ballot" elections in voting districts where an estimated 98 percent of where voters reside (See FAC p. 71-74), its reasoning fails to satisfy strict scrutiny. It is only in the districts most easy for voters to social distance that do not have local State or contested Congressional primaries. (See F.A.C. p. 72). When considering the COVID-19 argument to cancel the election (where Kellner called it "frivolous" to hold a presidential primary (F.A.C. p. 68), the court must take great scrutiny to challenge the State action to ask why the top-of-the-ticket is being cancelled by the State, but not the other elections still scheduled for June 23 <u>and</u> when all New York Demorats will be allowed to vote by mail (F.A.C. pp. 4, 62-63, 99).

The *Anderson-Burdick* balancing test[3] governs the constitutionality of laws regulating the right to vote. The U.S. Supreme Court laid out the framework in *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983) and *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992). *Anderson-Burdick* scrutiny is a flexible test that aims to balance citizens' constitutional right to vote against states' legitimate interests in regulating elections.

The *Anderson-Burdick* test requires courts to "weigh 'the character and magnitude of the asserted injury to the . . . rights that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

The *Anderson-Burdick* balancing test presents a spectrum bridging across two absolutes: Election laws that impose no burden on the right to vote are consequently subject to rational-basis review, while laws that severely burden the fundamental right to vote, such as a poll tax, trigger strict scrutiny, and must be "narrowly drawn to advance a state interest of compelling importance." *See Common Cause/New York,* 2020 U.S. Dist. LEXIS 4911, *69-70 (citing different cases as examples).

The circumstances of our case magnetizes the pendulum far to the strict scrutiny side of the spectrum: Even to describe what is at issue here as a voting "law" generously understates what has occurred because this was not enactment of a voting law, this was the *cancellation* of the

---

[3] This U.S. District Court applied this same balancing text/criteria in *Common Cause/New York v Brehm*, where Common Cause sued this same defendant with regard to its practice of voter purges from the voter registration and prevailed; the Court held that the State Board of Elections violated the State Constitution by designating certain registered voters as inactive and kept those voter names out of the poll books during elections.

presidential primary election in New York in favor of one candidate. N.Y. Election Law § 2-122-a(13) came into being by an appropriations bill on April 3, 2020 and only, by then, after the Plaintiff's had secured access to the ballot. The cancellation of the June 23 New York presidential primary -- purportedly on the basis of N.Y. Election Law § 2-122-a(13) -- deprive the Plaintiffs of their First Amendment right to assemble and their Fourteenth Amendment right to vote under Equal Protection. *See* FAC, Exs. A-H. Were it not for an emergency filing only possible in the eleventh-hour, many other Plaintiffs could have joined this lawsuit (*see, e.g.* FAC Exs., I-L reflecting non-parties' outrage at Defendant's action to deny their rights). As one example, Exhibit A hereto is a letter from an accounting Professor Christoper Pascale, a disabled US Veteran, who describes his deep lifetime sacrifices to secure Yang a place on the ballot, all to be swept away by an arbitrary and ill-conceived April 27 resolution made by the Defendant. This Court must deem New York Election Law § 2-122-a(13) to be unconstitutional because it strips ballot access away from Plaintiffs, and others similarly situated, who met all the requirements through exhaustive efforts and enabled only by great sacrifice.

It is important for the Court to notice that the voter's right to vote (and each of the Plaintiffs are voters) and the candidate's right to qualify to attain ballot access are comparable "overlapping" and "intertwined" rights. *See William v. Rhodes*, 393 U.S. 23, 30 (1968) and *Lubin v. Panish*, 415 U.S. 709, 716 (1974); *see also Burdick,* 504 U.S. at 438 (citing *Bullock v. Carter* – 405 U.S. at 143 – reasoning that "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters."). Here, the other "delegate"/voter Plaintiffs have already expressed that they favored casting a vote for Yang; consequently Yang's right to ballot access *is at least equal* to the rights of the other Plaintiffs to vote.

The standard of rigor that applies to Yang's right to ballot access – as a presidential primary candidate – applies with the same force here to the other Plaintiffs (apart from their being voters) as delegates to Yang as a primary presidential candidate. This is because, in New York, a voter only *indirectly* votes for a presidential candidate by supporting a delegate or delegates committed to him or her.

The Second Circuit has noted that, in the context of delegates to a national party convention, the right to vote for *electors /delegates* to the national party convention to influence party platform is meaningful – apart from the presidential primary candidate. *See, e.g., Rockefeller v Powers*, 74 F. 3d 1367,1380 (2nd Cir. 1995) ("Although popular attention may well focus on the number of delegates pledged to each candidate at the convention, the delegates themselves will also cast votes on platform issues and issues of party governance. No doubt, the chief purpose of many voters will be to send a message on presidential candidates at the Convention in Milwaukee (FAC pp. 58, 70). . . .In short, registered  Republicans in each district will be electing a slate of three people who are pledged to vote for a particular candidate, who may be freed to vote for anyone, and who will vote at the convention on other issues as well."); *see also* Statement from presidential campaign for Bernie Sanders, re "an outrage, a blow to American democracy" (F.AC. p 68)

        B.    <u>The Importance and Constitutional Necessity of Procedural Due Process</u>

11th Circuit and 5th cases desribe a "fundamental unfairness" standard that has not been embraced by the Second Circuit, but there is a more straightforward argument for denial of Plaintiff's denial of procedural due process.

Procedural due process requires the state to provide a hearing with notice when depriving someone of a substantive right. Because ballot access implicates First Amendment rights, a candidate's removal from the ballot must be accompanied by a hearing with notice. *See Rivera-Powell v. New York City Bd. Of Elections*, 470 F.3d 458, 464 (2d Cir. 2006) (procedural due process requirements were satisfied "because the state provided Rivera–Powell with a pre-deprivation hearing and an adequate judicial procedure by which to challenge any alleged illegalities in the Board's action"); *Thomas v. New York City Bd. Of Elections*, 898 F.Supp.2d 594, 599 (S.D.N.Y. 2012) (same); *Marchant v. New York City Bd. Of Elections*, 815 F.Supp.2d 568, 579 (E.D.N.Y. 2011) (same). The Second Amended Complaint will assert that neither Plaintiffs nor those similarly situated received any notice from Defendant and future Defendants.

The touchstone for determining whether the hearing must be provide pre-deprivation (i.e. before ballot removal) or may be provided post-deprivation is whether "the state conduct in question is random and unauthorized" or "pursuant to an established state procedure." *Rivera-Powell*, 470 F.3d at 465. "[W]hen the deprivation is pursuant to an established state procedure, *the state can predict when it will occur and is in the position to provide a pre-deprivation hearing*. Under those circumstances, 'the availability of post-deprivation procedures will not, ipso facto, satisfy due process.'" *Id.* (quoting *Hellenic American Neighborhood Action Committee v. City of New York*, 101 F.3d 877, 880 (2d Cir.1996)) (internal citations omitted).

Here, the Board acted pursuant to a statute and convened a meeting for the precise purpose of making the determination. Plaintiffs do not have to speculate to know that it was foreseeable to the Commissioners that they would be determining whether to kick candidates off the ballot – they publicly announced that they would be deliberating over and deciding this issue, weeks before they actually made the decision. Here's Kellner speaking on the eve of Bernie's

announcement: https://www.cityandstateny.com/articles/politics/campaigns-elections/new-york-presidential-primary-likely-canceled.html

Under these circumstances, they were required to provide aggrieved candidates with (1) notice of a hearing and (2) an opportunity to be heard and present defenses before they could remove them from the ballot.  Plaintiffs' ability to seek judicial review after the fact is insufficient under *Rivera-Powell*.

Plaintiffs nor other campaigns received notice of the April 27 meeting.  It will be plead in the Second Amended Complaint that another campaign asked if they could appear at the Commissioners' meeting to present evidence or argument, and they were told that we could not (because of the technical limitations of the Webex system used to conduct the meeting).

The Second Amended Complaint will please that the lack of process becomes more stark when considering the length of time the Board sat on its decision – the statute was enacted April 3[4], the Commissioners were quoted in the news as considering this issue as soon as Senator Sanders announced his suspension on April 8.  But the Defendant did not decide the issue until April 27 (and now they're arguing that this lawsuit needs to be decided in less than a week, ECF Dkt No. 4).  The Board's selective sense of urgency belies any argument that they could not have provided Plaintiffs with a proper hearing.

C.   Retroactivity of application of § 2-122-A(13) of the Election Law Denies Plaintiffs Constitutional Rights to Due Process

---

[4] Note, the F.A.C. incorrectly states that the Election Law was signed into effect on April 13, but it was April 3, 2020.

Attorney Malcom Seymour's argument in his April 26 letter to the Defendant argues that the Defendant should not apply a law retroactively (see F.A.C., Ex. K)

Conduct-regulating statutes such as § 2-122-A(13) of the Election Law are presumed not to apply retroactively unless the legislature clearly signals that they should reach past conduct. As Seymour writes on page 3 of his letter to Defendant on April 26:

[A]pplication of a new statute to conduct that has already occurred may, but does not necessarily, have 'retroactive' effect upsetting reliance interests and triggering fundamental concerns about fairness. . . . A statute has retroactive effect if 'it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed,' thus impacting 'substantive' rights. . . .

In light of these concerns, "[i]t takes a clear expression of the legislative purpose ... to justify a retroactive application" of a statute, which "assures that [the legislative body] itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." . . . The expression of intent must be sufficient to show that the Legislature contemplated the retroactive impact on substantive rights and intended that extraordinary result. Even within the same legislation, language may be sufficiently clear to effectuate application of some amendments to cases arising from past conduct but not others with more severe retroactive effect.

*Regina Metropolitan Co., LLC v. New York State Division of Housing and Community Renewal*, --- N.E. 3d ---, 2020 WL 1557900, at *10-11 (N.Y., April 2, 2020) (*quoting Landgraf v. USI Film Prods.*, 511 U.S. 244, 144 S.Ct. 1483, 128 L.Ed.2d 229 (U.S. 1994); *Gleason v. Gleason*, 26 N.Y.2d 28, 36 (N.Y. 1970)) (internal citations omitted).

The retroactive application of § 2-122-A(13) would severely impact aggrieved candidates' core substantive rights. Invoking this provision against Yang and similarly situated candidates would subject them to the prospect of involuntary ballot removal, notwithstanding their satisfaction of all legal prerequisites for ballot access. Because of the severity of this potential deprivation, the presumption against retroactive application must operate with maximum force.

Section 2-122-A(13) was not on the books when Yang or other similarly situated candidsates announced the partial suspension of their campaigns.  Yang had no opportunity to conform his conduct (by exploring alternatives to formal "suspension") to avoid adverse application of this new provision.  The presumption against retroactive application dictates that, if the legislature truly intends to deprive a candidate of political rights by surprise and without prior notice, it must clearly say so.  Because the statute here does not clearly state that it applies to announcements made before the law's passage, the presumption is not overcome.  The law should not be interpreted to apply to announcements made prior to April 3.

## D.   Defendant's Actions Violated Plaintiff's First Amendment Rights

With limited exceptions for elected judges, restrictions on the political speech of political candidates are subject to strict scrutiny, and rarely upheld.  Speech rights are implicated by the statute because it allows the Defendant to remove a candidate from the ballot if the candidate publicly announces the suspension of his campaign.  Suspension itself is not the trigger, speech is – and this is core political speech.  This is the text of the law Plaintiff are challenging:

> Notwithstanding any inconsistent provision of law to the contrary, prior to forty-five days before the actual date of a presidential primary election, if a candidate for office of the president of the United States who is otherwise eligible to appear on the presidential primary ballot to provide for the election of delegates to a national party convention or a national party conference in any presidential election year, publicly announces that they are no longer seeking the nomination for the office of president of the United States, or if the candidate publicly announces that they are terminating or suspending their campaign, or if the candidate sends a letter to the state board of elections indicating they no longer wish to appear on the ballot, the state board of elections may determine by such date that the candidate is no longer eligible and omit said candidate from the ballot.

Nowhere does it say that suspension itself disqualifies a candidate. To the extent that the law creates new adverse consequences (ineligibility to run as a candidate) for making certain types of

political speech, it is a content-based speech regulation subject to strict scrutiny under the First and Fourteenth Amendments.  Depriving Yang and others similarly situated of his right to be on the ballot because of something he said is a violation of his rights under the First Amendment.  *See Dinler v. City of New York*, 04-CV-7921 (RJS)(JCF), 2012 WL 4513352, at *22 (S.D.N.Y. Sept. 30, 2012) (laws prohibiting certain campaign-related speech are "content-based" restraints on speech, subject to a heightened form of strict scrutiny because they pertain to political speech).  "When a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *McIntyre v.Ohio Elections Comm'n,* 514 U.S. 334, 347 (1995).

The law here was not narrowly tailored, because it did not look at whether candidates had in fact suspended their campaigns.  It is possible, and is in fact the case for Yang and other such as Senator Sanders, that they may wish to assist in party unification efforts by making certain public statements.  Even after making these statements, their campaigns may continue to operate, and may remain a going concern.  Candidates should not be punished with ballot removal because of what they say, especially when their public statements might not be a complete indication of what their campaigns are doing.


**The 11th Amendment of the U.S. Const. Does Not Bar Jurisdiction of this Court by Sovereign Immunity in this Action as all Plaintiffs are New York Residents, Citizens, Candidates and Most Importantly New York Voters and the United State's Supreme Court Doctrine of *Ex Parte Young* Protects Federally Guaranteed Rights, Particularly Civil Rights Such as Voting Rights**

On April 29, 2020, the Court directed Plaintiffs to submit a memorandum of law in support of their application seeking emergency relief by April 30, 2020, and Defendant to respond by May 1, 2020. (ECF Dkt. No. 5.)

Judge Torres ordered on April 30 (ECF Dkt. No. 9) that the parties' briefs shall address the question of the Court's subject matter jurisdiction, including the effect, if any, of the Eleventh Amendment to the United States Constitution, citing *Murawski v. NY. State Bd. of Elections*, 285 F. Supp. 3d 691, 695-96 (S.D.N.Y. 2018) and *Tiraco v. NY. State Bd. of Elections*, 963 F. Supp. 2d 184, 192- 93 (E.D.N.Y. 2013).

Judge Torres in her April 30 order directed that the parties brief the issue of sovereign immunity, as it applies in this action pursuant the 11th Amendment of the U.S. Constitution. She cites only two cases that are both not determinative to this matter, each from district courts in this circuit.

First, in *Murawski v. NY. State Bd. of Elections*, 285 F. Supp. 3d 691, 695-96 (S.D.N.Y. 2018), an individual was denied ballot access and attempted to sue Defendant after failing to make ballot access. This case is distinguishable from the present in that Murakwski did not comply with the New York Election Law and simply complained that the signature requirements were too arduous. In the present action, all Plaintiffs took extraordinary effort to comply with the Election (see F.A.C. paras. 56 and 57, and Exhibits B, C, D, E, F, G, H and non-party affidavits in Exs. I and K). Furthermore, in Murawski, the plaintiff was running for a local election, not a Federal Election as in the present case.

Second, Judge Torres references in her order *Tiraco v. N.Y. State Bd. of Elections*, 963 F. Supp. 2d 184, 191-92 (E.D.N.Y. 2013), in which the plaintiff attempted to secure ballot access to run for congressional office as the Independence Party candidate for the 6th Congressional

District in Queens, New York. In Tiraco, the plaintiff complained that the The New York City

Board of Elections, a subdivision of the Defendant herein, did not provide Plaintiff with the

requested items and instead advised Plaintiff that the requested information was not to be

delivered in a timely manner before they would be useful to the plaintiff and they also claimed to

not have access to the information at the time of the plaintiff's request (see *Id*., 188-89). While

pertaining to a federal (albeit third-party) election as in the present matter, it is further

distinguishable since unlike in the present action, the plaintiff did not meet the clearly set out

requirements of the New York Election Law to secure ballot access as the present Plaintiffs have

dutifully and righteously done.

In *Tiraco*, the Judge Matsumoto sets out the law as follows (citations partially omitted):

The state may waive its sovereign immunity by consenting to suit in federal court. *Iwachiw v. N.Y. City Bd. of Elections*,217 F.Supp.2d 374, 379 (E.D.N.Y.2002). Second, Congress may abrogate state sovereign immunity by acting pursuant to a grant of constitutional authority. *Id*. Third, under the *Ex parte Young* doctrine, sovereign immunity does not preclude a plaintiff from seeking prospective injunctive relief or declaratory relief against a state official acting in his or her official capacity for ongoing violations of federal law. *State Emps. Bargaining Agent Coal. v. Rowland*,494 F.3d 71, 95 (2d Cir.2007); Anghel v. N.Y. State Dep't of Health,947 F.Supp.2d 284, 298, No. 12–CV–3484, 2013 WL 2338153, at *9 (E.D.N.Y. May 29, 2013) (holding that "the doctrine of Ex Parte Young ... 'allows a suit for injunctive [or declaratory] relief challenging the constitutionality of a state official's actions in enforcing state law' " (alteration in original) (quoting CSX Transp., Inc. v. N.Y. State Office of Real Prop. Servs.,306 F.3d 87, 98 (2d Cir.2002))).

The first two exceptions arguably may not apply, unless for reasons of judicial economy,

the Defendant will allow this Federal case to continue (rather than have Plaintiffs buy a new

index number in New York Supreme Court) or the State's good attorney general cannot ethically

defend the Defendant's actions to disenfranchise New York voters. However, the *Ex Parte*

*Young* exception clearly does apply and allows this court to accept jurisdiction.

The *Ex Parte Young* doctrine is the law of our land and applies to this action to allow this court jurisdiction (*Ex Parte Edward T. Young, Petitioner*, 209 U.S. 123 (1908). It allows suits in Federal courts for injunctions against officials acting on behalf of the states of the union to proceed despite the State's sovereign immunity, when the State has acted against Federal law or contrary to the Constitution, as is the situation herein has been plead by Plaintiffs (see F.A.C. para. 80 *et. seq.)*.

Defendant's Resolution passed April 27 (see ECF Dkt. No. pps. 3-4) is an interpretation of §2-122-A(13) of the NY Election Law and for whatever reason, Defendant's failed to consider the constitutional rights of New York voters and candidates that would be infringed by removing duly qualified candidates pursuant to this *ex post facto* law passed after the candidates had dutifully done the work to comply with and achieve ballot access under the relevant provisions of the New York Election Law. Plaintiffs have argued in the F.A.C. that §2-122-A(13) of NY Election Law infringes their constitutional rights, most germanely their right to vote.

Here, Plaintiff's have not sued Commissioner's Douglas Kellner and Andrew Spano, individually, as officers of the State, but as this is an emergency action under FRCP 65, suing the Defendant board was done for judicial economy (finding the individual officers in a timely manner during the COVID-19 pandemic, and finding a process server at this time, is simply not reasonable). This matter has been rendered   moot by Judge Torres' Order in ECF Dkt. No. 11, granting Plaintiff leave to amend to add additional defendants. At the time of this submission to the Court, Plaintiff's intend to add as many additional Defendants as reasonable to secure justice and the rights of their clients.

If the court were to decline jurisdiction on the basis of sovereign immunity, it would be a miscarriage of justice and tantamount to assisting the State in stripping Plaintiffs of their Constitutionally guaranteed rights and probably immediately appealed to the 2nd Circuit. Additionally, there is evidence that §2-122-A(13) of NY Election Law and the resulting interpretation through the April 27 Resolution by Commissioners Gellner and Spano violates the NY State Constitution - and that if this Court declines jurisdiction, it is simply helping the State disenfranchise voters by forcing Plaintiffs to go to State court where they may not be able to gain timely or unbiased redress (see Center for Justicial Accountability, Inc., last visited April 30, which argues that  §2-122-A(13) of NY Election Law violates the NY Constitution because the law is a policy law that was slipped into an appropriations bill (S7506B), http://www.judgewatch.org/web-pages/elections/2020/good-news-for-yang-and-sanders.htm). To rectify inartful pleading by counsel, the undersigned requested via letter motion to Judge Torres (ECF Dk. 10, filed April 30, 2020) for leave to amend the First Amended Complaint to add additional defendants to this action, such as Commissioners Gellner and Spano. Fortunately, Plaintiff's letter motion was granted to allow the filing of a Second Amended Complaint by noon on Friday, May 1, 2020.

One of the most helpful cases to the Court is the one cited in Kellner's letter (ECF Dkt. No. 4), *Ashe v. Board of Elections of City of New York*, Case No. CV-88-1566, 1988 WL 95427 (E.D.N.Y. Sept. 8, 1988).  *Ashe* establishes that the 11th Amendment sovereign immunity doctrine will not bar a suit against a state government official, acting in her or his official capacity, as long as (1) we allege the official was acting contrary to the U.S. Constitution and (2) we seek only injunctive, not monetary, relief.  "*Ex Parte Young*, as noted above, allows for injunctive relief against state officers. In Young, the Court noted that 'a particular relation'

between the officer or agency sued and the constitutional violation was necessary to find liability." *Ashe*, 1988 WL 95427, at *2.  The decision in *Ashe* centered largely on whether Board of Elections officials had the "particular relation" required to be properly named as defendants under *Young*.  The Court held emphatically that the BOE's plenary supervision of elections within the state made the BOE officials the correct defendants.  *Id.* at *3.  In the present case, the 'particular relation' is even more clear cut, because the statute under which candidates were removed from the ballot vests authority in the two Democratic commissioners, and nobody else.  It is clear, from the statute and the record, that Kellner and Spano made the decision.  Plaintiffs intend to add Commissioners Kellner and Spano as Defendants in the Second Amended Complaint.

## CONCLUSION

Finally, the common sense answer is usually the best answer when it comes to interpretation of the law. If the Federal courts cannot act to protect federally guaranteed rights by enjoining state action, particularly as they apply to federally guaranteed civil rights, then we cannot claim to live in a free and democratic society. States do not and cannot have carte blanche sovereign immunity to defy the United Constitution if we are to operate in a functioning and free federal republic. Defendants should do the right and rescind their Resolution of April and allow Plaintiff access to the June 23, 2020 ballot.

Plaintiffs make numerous arguments in their complaint why Federal court is the most appropriate venue for adjudication of this dispute (see F.A.C. para. 47). As stated in the complaint, our country has a proud history of Federal courts enforcing Federally protected rights as they pertain to state action (See F.A.C. para. 48, citing Brown v. Board of Education of

Topeka, 347 U.S. 483 (1954). For these reasons, this Court must accept subject matter jurisdiction of this action and decide with Plaintiffs.


April 30, 2020

Respectfully submitted,


By: _/s/ Jeffrey M. Kurzon_____
Jeffrey Mead Kurzon, Esq.
Bar No. JM3388
Jeff@Kurzon.com


By: _/s/ Leonard M. Kohen_____
Leonard M. Kohen, Esq.
Bar No. LK3000
Leonard.Kohen@Kurzon.com

**KURZON KOHEN LLP**
305 Broadway, FL 7
New York, NY 10007
Phone/Fax: 212-203-8918
www.Kurzon.com
Attorneys for Plaintiffs,
and all others similarly situated