UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANDREW YANG, JONATHAN HERZOG, HELLEN SUH,
BRIAN VOGEL, SHLOMO SMALL, ALISON HWANG,
KRISTEN MEDEIROS and DR. ROGER GREEN,
individually and on behalf of all others similarly situated,

                                        Plaintiffs,

                    v.

DOUGLAS A. KELLNER, Co-Chair and Commissioner,
ANDREW SPANO, Commissioner, PETER S. KOSINSKI,
Co-Chair, TODD D. VALENTINE, Co-Executive Director,
and ROBERT A. BREHM, Co-Executive Director,
individually and in their official capacities at the New York
State Board of Elections, and the NEW YORK STATE
BOARD OF ELECTIONS,

                                        Defendants.

No. 20-cv-3325 (AT)

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

LETITIA JAMES
Attorney General
State of New York
*Attorney for State Defendants*
28 Liberty Street
New York, NY 10005
(212) 416-6352

Matthew L. Conrad
Assistant Attorney General
Of Counsel

Defendants Douglas A. Kellner, Co-Chair and Commissioner, Andrew Spano, Commissioner, Peter S. Kosinski, Co-Chair, Todd D. Valentine, Co-Executive Director, and Robert A. Brehm, Co-Executive Director, individually and in their official capacities at the New York State Board of Elections, and the New York State Board of Elections (the "State Board"), (defendants, collectively, the "State Defendants") respectfully submit this memorandum of law, together with the accompanying Declaration of Robert A. Brehm dated May 1, 2020 ("Brehm Decl."), in opposition to Plaintiffs' request for emergency relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The United States, and New York State in particular, are currently in the midst of the COVID-19 pandemic, a public health emergency of historic proportions. Medical experts have uniformly advised that the minimization of social contact is of paramount importance to reducing the illness and death caused by this pandemic, and New York's elected leaders have taken and continue to take steps to reduce the amount of social contact that New Yorkers must engage in, while preserving New Yorkers' civil rights, including the right to participate in free and fair elections.  Among the events affected by the ongoing public health and fiscal emergency is the 2020 election season, including the Democratic Presidential Primary Election. Elections are necessarily a social occasion, involving protracted contact between voters and poll workers.  Even with increased absentee voting, holding elections and certifying results requires the on-site presence of numerous county-level and state-level election officials, many of whom have already fallen sick or perished doing their essential work.

Under these unprecedented circumstances, the public interest in protecting the health of voters, poll workers, and election officials in the midst of a global pandemic vastly outweighs

whatever interest, if any, a former candidate and his "prospective" delegates have in being on the ballot for a nomination that no one disputes is now uncontested. As demonstrated herein, Plaintiffs have not come close to meeting their heavy burden to show they are entitled to the extraordinary relief of a mandatory injunction that would upset New York's already strained election machinery. If granted, the requested injunction could have catastrophic effects on public health and the ability of county election boards to safely and fairly conduct the primary election for those races that are, in fact, still contested.

In particular, due to the pandemic emergency, by executive order on March 28, 2020, the Democratic Presidential Primary Election was moved from April 28 to June 23, 2020. Meanwhile, all but one of the candidates for the Democratic Presidential nomination have dropped out of the race. The New York State Legislature passed New York Election Law § 2-122-a(13), which permitted the State Board to remove from the ballot candidates who had suspended or terminated their campaigns, and were therefore no longer seeking the Democratic Presidential nomination. At the time the State Board considered the issue at its public April 27, 2020, meeting, it is undisputed that there was only one candidate still seeking the Democratic Presidential nomination. Long-standing state law provides that uncontested primary elections need not be held, and, as the Democratic Presidential Primary Election is no longer contested, it need not be held. This common-sense conclusion will protect voters and election workers from unnecessary social contact at a time when the importance of minimizing the spread of COVID-19 remains of paramount importance and will also conserve the funds of shattered municipal and state budgets.

Plaintiffs, a former candidate for the Democratic nomination, and multiple of his prospective delegates ask this Court to force the State Board to require an uncontested election. To do so would be to put numerous people in harm's way for little, if any, practical effect. In view

of Plaintiffs' failure to satisfy any of the requirements for issuance of a preliminary injunction, the

Court should deny Plaintiffs' request for emergency relief.

## STATEMENT OF FACTS

**A.      Statutory Background**

New York Election Law ("Election Law") § 2-122-a (13) provides that:

> if a candidate for office of the president of the United States…publicly
> announces that they are no longer seeking the nomination for the office of
> president of the United States, or if the candidate announces that they are
> terminating or suspending their campaign, or if the candidate sends a letter
> to the state board of elections indicating they no longer wish to appear on
> the ballot, the state board of elections may determine…that the candidate is
> no longer eligible and omit said candidate from the ballot; …

In short, this provision embodies a reasonable principle: if a presidential candidate drops out of

the race, the State Board may determine to omit the candidate from the primary ballot.

Election Law § 6-160(2) provides that in party primary elections where there is only one

candidate on the ballot that candidate "shall be deemed nominated…without balloting."[1]

In conjunction, the effect of these two statutes is to permit the cancellation of a scheduled

presidential primary election where all but one candidate has withdrawn from the nomination

process.

The Election Law also provides that the selection of the New York State Democratic

Party's delegates to the National Convention of the Party is primarily governed by the Party's

---

[1] Statutes deeming an unopposed primary candidate to be nominated are unremarkable, and exist
in numerous states. See, e.g., Conn. Gen. Stat. § 9-416; Del. Code tit. 15, § 3301; Minn. Stat. §
204D.03; N.C. Gen. Stat. § 163-110; Va. Code § 24.2-526; S.C. Code § 7-11-90. Such statutes
were explicitly endorsed by the Supreme Court in one of the leading cases on the constitutionality
of state election laws. Burdick v. Takushi, 504 U.S. 428, 439 (1992) ("Hawaii further promotes
the two-stage, primary-general election process of winnowing out candidates by permitting the
unopposed victors in certain primaries to be designated office-holders. This focuses the attention
of voters upon contested races in the general election. This would not be possible, absent the write-
in voting ban.") (internal citations omitted).

rules.  See N.Y. Election Law § 2-122 (a); Brehm Decl. ¶¶ 28-38.  As such, it is the New York

State Democratic Party – not the State Board – that establishes the rules for the ultimate selection

of its national delegates.  Id.  The Supreme Court has held that, within limits, states should defer

to party rules for delegate selection.  See New York State Bd. of Elections v. Lopez Torres, 552

U.S. 196, 202 (2008) ("A political party has a First Amendment right to limit its membership as it

wishes, and to choose a candidate-selection process that will in its view produce the nominee who

best represents its political platform."); Democratic Party of U.S. v. Wisconsin, 450 U.S. 107, 123-

24 (1981) ("a State, or a court, may not constitutionally substitute its own judgment for that of the

Party").

## B.      The COVID-19 Public Health Emergency

The backdrop of this case is the ongoing COVID-19 pandemic that has, to date, caused

tens of thousands of deaths in New York State and nationwide, and hundreds of thousands of

deaths worldwide. Such deaths have included election workers, who on average tend to be at higher

risk of complications from COVID-19.  Brehm Decl. ¶¶ 45-46.  A comprehensive overview of the

ongoing health crisis is beyond the scope of this memorandum, but for present purposes, it is

sufficient to note that the coronavirus that causes the COVID-19 illness is highly infectious and

can cause severe acute respiratory syndrome in humans that can lead to extensive hospitalization

or death.[2] Health authorities have advised that combating the spread of the virus requires the

widespread adoption and enforcement of "social distancing"—the practice of avoiding groups and

mass gatherings. According to the Centers for Disease Control, "[l]imiting face-to-face contact

with others is the best way to reduce the spread of coronavirus disease 2019 (COVID-19)."[3]

---

[2] https://www.cdc.gov/coronavirus/2019-ncov/index.html

[3] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html

Several months into the worldwide spread of the pandemic, it is now clear that avoiding unnecessary personal interaction has "flattened the curve," and potentially saved an untold number of lives.[4]  However, restrictions on social gatherings may continue to be necessary for months more to prevent a resurgence of COVID-19 infections and numerous needless deaths.[5]  Such measures are not without societal cost, but they are clearly necessary to address this unprecedented public health crisis.

**C.      Plaintiff Yang and the Race to be the Democratic Presidential Nominee**

Plaintiff Andrew Yang was, until February 11, 2020[6], seeking the nomination of the Democratic Party for the 2020 United States Presidential election. The other plaintiffs were candidates for delegate to the Democratic National Convention pledged to represent Plaintiff Yang.  Second Amended Complaint dated May 1, 2020 ¶¶ 13-40. On February 11, 2020, Plaintiff Yang suspended his campaign, explaining "I am the math guy, and it is clear tonight from the

---

[4] E.g. Erin Mansfield, *As the coronavirus curve flattened, even hard-hit New York had enough ventilators*, USA TODAY (Apr. 28, 2020) ("Hospitals in hard-hit areas needed fewer ventilators than expected, experts say, because social distancing and lockdowns meant that COVID-19 cases peaked earlier and at lower numbers."), https://www.usatoday.com/story/news/2020/04/28/coronavirus-hospitals-avoid-ventilator-shortage-curve-new-york-flattens/3036008001/; *Jason Slotkin, New York's Daily COVID-19 Deaths Below 400 For First Time In April*, NPR (Apr. 26, 2020) ("[Governor Andrew Cuomo] largely attributed the decline to the efforts of New Yorkers adhering to social distancing, saying his role was to provide 'facts' to New Yorkers who were willing to act responsibly."), https://www.npr.org/sections/coronavirus-live-updates/2020/04/26/845199791/new-yorks-daily-covid-19-deaths-below-400-for-first-time-in-april.

[5] E.g. Benjamin Fearnow, *Dr. Deborah Birx Says Social Distancing Must Continue Through Summer Months*, NEWSWEEK (Apr. 26, 2020), https://www.newsweek.com/dr-deborah-birx-says-social-distancing-must-continue-through-summer-months-1500267; Leah Asmelash & Maggie Fox, *US may have to endure social distancing until 2022 if no vaccine is quickly found, scientists predict*, CNN (Apr. 15, 2020), https://www.cnn.com/2020/04/14/health/social-distancing-research-coronavirus-2022-trnd/index.html.

[6] E.g. Matt Stevens, *Andrew Yang Drops Out: 'It Is Clear Tonight From the Numbers That We Are Not Going to Win'*, NEW YORK TIMES (February 11, 2020), https://www.nytimes.com/2020/02/11/us/politics/andrew-yang-drops-out.html

numbers that we are not going to win this race. . . . So tonight I am announcing that I am suspending my campaign."[7] On March 5, 2020, Plaintiff Yang's campaign notified the Federal Elections Commission that "Friends of Andrew Yang . . . will assume a quarterly filing schedule now that Andrew Yang is no longer an active candidate."[8] On March 10, 2020, Plaintiff Yang endorsed fellow candidate former Vice President Joe Biden for the nomination.[9]

Plaintiff Yang was one of eleven candidates for the Democratic nomination, all of whom have ended their presidential campaign except for one.  Brehm Decl. ¶ 7.  Among those who earned pledged delegates prior to dropping out were Senator Bernie Sanders, who withdrew from the race on April 8, 2020; Representative Tulsi Gabbard (withdrew March 19, 2020); Senator Elizabeth Warren (withdrew March 5, 2020); former Mayor Michael Bloomberg (withdrew March 4, 2020), Senator Amy Klobuchar (withdrew March 2, 2020); and former Mayor Pete Buttigieg (withdrew March 1, 2020).  Id.  The only remaining candidate is former Vice President Joe Biden.  Id.

**D.    The State Board Issues A Resolution Removing Candidates Who Are No Longer Running From The Presidential Primary Ballot, Which Results In An Uncontested Primary**

On April 3, 2020, the New York State Legislature passed Chapter 56 of the Laws of 2020. Among the provisions of this bill was the addition to the Election Law of Section 2-122-a(13).[10] A meeting of the Democratic commissioners of the State Board was scheduled and publicly

---

[7] Id.

[8] https://docquery.fec.gov/dcdev/fectxt/1388101.txt

[9] E.g. Paul LeBlanc, *Andrew Yang Endorses Joe Biden for president*, CNN (March 11, 2020), https://www.cnn.com/2020/03/10/politics/andrew-yang-endorses-joe-biden/index.html.

[10] Plaintiffs argue that this revision to the Election Law was "hidden" in an appropriations bill, but this provision was known to the public and was being reported on within days of the Legislature's passage.  E.g. Rebecca C. Lewis, *New York Democratic presidential primary likely canceled*, CITY & STATE NEW YORK (Apr. 8, 2020), https://www.cityandstateny.com/articles/politics/campaigns-elections/new-york-presidential-primary-likely-canceled.html.

noticed for April 22, 2020, and notice of the meeting was directly provided to the campaign contacts for every former candidate, including Plaintiff Yang, informing them that the State Board would be making a determination pursuant to Election Law § 2-122-a(13).  Brehm Decl. ¶¶ 18-27. The meeting was subsequently rescheduled for April 27, 2020, as posted on the State Board's public website.  Id. ¶ 21.

On April 27, 2020, in accordance with Election Law § 2-122-a(13), the Democratic commissioners of the State Board voted to remove from the presidential primary ballot those candidates who had suspended their campaigns and withdrawn from seeking the nomination. Brehm Decl. ¶¶ 18-19.  As this left Vice President Biden as the only remaining candidate, pursuant to Election Law § 6-160(2), the June 23, 2020 New York Democratic Presidential Primary was no longer necessary.  Brehm Decl. ¶¶ 4, 50.  While primaries for other *contested* positions will still be held on that date, the Democratic Presidential Primary was the only remaining scheduled contest in numerous election districts across New York, negating the need for election workers and voters to gather at polling sites notwithstanding the urgent benefits of maintaining social distancing in light of the ongoing COVID-19 pandemic.  Brehm Decl. ¶¶ 40-54. In election districts that still have an actually contested primary, moreover, the efforts of front-line election workers can be better directed towards conducting those contests safely and fairly in the face of an unprecedented public health crisis.  Id.

## PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Resources Defense Counsel, 555 U.S. 7, 24 (2008). Generally, the party seeking a preliminary injunction must establish "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground

for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 215 (2d Cir. 2012) (quoting UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc., 660 F.3d 643, 648 (2d Cir. 2011))

However, where, as here, a case involves "governmental action taken in the public interest pursuant to a statutory or regulatory scheme," a plaintiff cannot rely on the "fair-ground-for-litigation" alternative. Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs., 769 F.3d 105, 110 (2d Cir. 2014) (quoting Plaza Health Labs., Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1989) (internal citations omitted)). The Second Circuit has espoused that such an exception "reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." Otoe-Missouria Tribe, 769 F.3d at 110, quoting Able v. United States, 44 F.3d 128, 131 (2d Cir. 1995). Further, where a party seeks to enjoin legislation developed through the "presumptively reasoned democratic processes," a party must demonstrate a *likelihood* of success on the merits, rather than only a probability of success. E.g. Olson v. Wing, 281 F. Supp. 2d 476, 485 (E.D.N.Y.), aff'd, 66 F. App'x 275 (2d Cir. 2003), citing Able v. U.S., 44 F.3d 128, 131 (2d Cir. 1995) (emphasis added). This heightened requirement again reflects the fundamental principle that courts should defer to government policies implemented through the democratic process. Olson, 281 F. Supp. 2d at 485, quoting Karmel v. City of N.Y., 200 F. Supp. 2d 361, 365 (S.D.N.Y. 2002).

In addition, the Second Circuit has held the movant to a heightened standard where: (i) an injunction is "mandatory,"[11] or (ii) the injunction "will provide the movant with substantially all

---

[11] Courts refer to preliminary injunctions as either prohibitory injunctions, which maintain the

the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." People ex.rel. Schneiderman v. Actavis PLLC, 787 F.3d 638, 650 (2d Cir. 2015), citing Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 33-34 (2d Cir. 1995). When either condition is met, the movant must show a "clear" or "substantial" likelihood of success on the merits, Beal v. Stern, 184 F.3d 117, 123 (2d Cir. 1999), and make a "strong showing" of irreparable harm, Doe v. N.Y. Univ., 666 F.2d 761, 773 (2d Cir. 1981), in addition to showing that the preliminary injunction is in the public interest. Actavis, 787 F.3d at 650. This heightened standard applies here, since both (i) the requested injunction is "mandatory," as it would require the State Board to alter the current status quo by scheduling an election that is currently not planned to occur, including recruiting and training poll workers; and (ii) Plaintiffs' action is focused on a primary election date scheduled for June 23, 2020, and a preliminary injunction would as a practical matter give them all the relief they seek for that election, as the ballots for that election cannot be changed following the May 9 deadline for distribution of certain absentee ballots. See Letter of the State Board Commissioner Douglas A. Kellner, ECF no. 4 (requesting the acceleration of the instant proceeding). Preliminary injunctive relief, if granted now, would very likely confer on plaintiffs the benefits they seek for the June 23 primary election and could not be undone even if the State Board prevails at a trial on the merits thereafter.

In sum, where, as here, a party seeks a mandatory injunction against government action taken in the public interest pursuant to a valid statutory scheme, it must demonstrate all of the following factors: (1) a clear or substantial likelihood of success on the merits of the underlying claim, (2) a strong showing of irreparable harm absent injunctive relief, and (3) that the public

---

status quo pending resolution of the case, or mandatory injunctions, which alter the status quo. N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc., 883 F.3d 32, 36 (2d Cir. 2018).

interest weighs in favor of granting the injunction. See Pope v. Cty. of Albany, 687 F.3d 565, 570 (2d Cir. 2012); Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton, 841 F.3d 133, 143 (2d Cir. 2016). As demonstrated herein, Plaintiffs cannot satisfy their heavy burden with respect to any of the essential criteria for a preliminary injunction, and therefore the Court should deny Plaintiffs' motion.

## **ARGUMENT**

## I.  **AS A THRESHOLD MATTER, THE CLAIMS AGAINST THE STATE BOARD AND THE STATE CLAIMS ARE BARRED BY THE ELEVENTH AMENDMENT**

The Eleventh Amendment to the U.S. Constitution bars federal suits against a state and its agencies unless (i) the state unambiguously consents to be sued, or (ii) Congress has enacted legislation explicitly, unmistakably, and validly abrogating the state's Eleventh Amendment immunity. Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54-55 (1996); Papasan v. Allain, 478 U.S. 265, 276 (1986); Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 100 (1984). This bar applies regardless of the remedy sought, precluding injunctive as well as monetary relief. Missouri v. Fiske, 290 U.S. 18, 27 (1933); Alabama v. Pugh, 438 U.S. 781, 782 (1978) (per curiam); Cory v. White, 457 U.S. 85, 90-91 (1982). This bar applies equally to lawsuits in federal court alleging violations of state law. Regents of the Univ. of Calif. v. Doe, 519 U.S. 425, 431 (1997); Pennhurst, 465 U.S. at 123. State agencies, as "arms of the state," are included in this immunity. See Walker v. City of Waterbury, 253 Fed.Appx. 58, 60 (2d Cir. 2007) (citing Mancuso v. N.Y. State Thruway Auth., 86 F.3d 289, 292 (2d Cir. 1996)).  Even where claims against state officials are brought pursuant to Ex Parte Young, 202 U.S. 123 (1908), this exception does not allow a federal court to issue an injunction for a violation of state law.  See Kelly v. New York Civil Serv. Comm'n, 632 F. App'x 17, 18 (2d Cir. 2016), citing Pennhurst, 465 U.S. at 106.

"It is well-established that New York has not consented to § 1983 lawsuits in federal court

. . . ." <u>Mamot v. Bd. of Regents</u>, 367 F. App'x 191, 192 (2d Cir. 2010); <u>see also</u> <u>Tiraco v. N.Y. St.</u> <u>Bd. of Elections</u>, 963 F. Supp. 2d 184 (E.D.N.Y. 2013) (dismissing § 1983 claims against the State Board on Eleventh Amendment immunity grounds); <u>Dekom v. New York</u>, 2013 WL 3095010 (E.D.N.Y. June 18, 2013), at *10 (dismissing § 1983 claims against the State Board on Eleventh Amendment immunity grounds), aff'd, 583 F. App'x 15 (2d Cir. 2014); <u>Iwachiw v. N.Y. City Bd.</u> <u>of Elections</u>, 217 F. Supp. 2d 374, 379-80 (E.D.N.Y.2002) (noting that New York has not waived Eleventh Amendment immunity in suits involving potential United States Senatorial write-in candidates), <u>aff'd</u>, 126 F. App'x 27 (2d Cir. 2005) (summary order). Nor has Congress abrogated New York's sovereign immunity from suit pursuant to 42 U.S.C. § 1983. <u>See, e.g.</u>, <u>Will v.</u> <u>Michigan Dep't of State Police</u>, 491 U.S. 58, 66-67 (1989) (§ 1983 does not abrogate Eleventh Amendment immunity); <u>Sargent v. Emons</u>, 582 F. App'x 51, 52 (2d Cir. 2014) ("[I]t is well established that Congress did not abrogate state sovereign immunity in enacting 42 U.S.C. § 1983[.]"); <u>Tiraco</u>, 963 F. Supp. 2d at 192.

As such, Plaintiffs' claims against the State Board are barred by the Eleventh Amendment and must be dismissed. Likewise, Plaintiffs' claims against various State Board officials in their official capacity are barred to the extent that they seek any relief not properly characterized as prospective and injunctive in nature. Moreover, the <u>Ex Parte Young</u> doctrine does not permit a federal court to issue an injunction for a violation of state law, and as such all of Plaintiffs' claims pursuant to New York State law must be dismissed. <u>See</u> <u>Kelly</u>, 632 F. App'x at 18.

## II.    PLAINTIFFS CANNOT DEMONSTRATE A CLEAR OR SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS

Plaintiffs' motion for a preliminary injunction that would alter the status quo should be denied because they have not demonstrated "a clear or substantial likelihood of success on the merits." <u>Mastrovincenzo v. City of N.Y.</u>, 435 F.3d 78, 89 (2d Cir. 2006) (emphasis added; internal

quotations omitted). Nor *can* plaintiffs make this demanding showing.[12]

### A.  The Plaintiffs Who Were Running for Delegate Office Lack Standing

As a preliminary question, it is unlikely that any of the plaintiffs will be able to demonstrate that they have standing to bring suit.  See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) ("Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact' an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical,' . . . .") (citations and quotation marks omitted).

With respect to the plaintiffs who sought to be Yang delegates, the Democratic Presidential Primary election would not actually have determined whether they would, in fact, serve as delegates to the Democratic National Convention.  Pursuant to Election Law § 2-122(a)(1), under which Democratic presidential primary elections are held, the State Board holds a contest on behalf of the New York State Democratic Committee, but it is the Committee which then determines how to select delegates according to its own rules and party procedures, using a delegate selection plan that may diverge from the vote totals based on gender and the presidential candidate's ability to veto specific delegates.  See Brehm Decl. ¶¶ 28-38.  In fact, a presidential candidate need not even have a slate of delegates to earn delegates; to the extent a presidential candidate does field delegates, the primary for delegate serves only to organize the candidate's slate should they receive enough votes to earn delegates.  Id.

---

[12] Plaintiffs' "individual capacity" claims against the Board members must be dismissed as well:
> [Plaintiff] is not entitled to an injunction against [defendants] because he is suing them in their individual capacities only. . . . Injunctive relief may only be recovered from parties in their official capacities.

Ziemba v. Armstrong, 2004 WL 1737447, at *2 (D. Conn. 2004), quoting Kentucky v. Graham, 473 U.S. 159, 167–68 (1985) (internal citations omitted).

As a result, the putative delegate plaintiffs are not directly affected by whether Plaintiff Yang is on the ballot or, indeed, whether the Democratic Presidential Primary is held or not. This is illustrated by the reported agreement between the Biden and Sanders campaigns to allocate among themselves representation in the New York delegation to the Democratic National Conference.[13]  Any interest in serving as delegates to the Democratic National Convention is not of a constitutional dimension and any harm to that interest would not be redressed by any order directed towards the members of the State Board. Lujan, 504 U.S. at 575 ("[T]o entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action, he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action, and *it is not sufficient that he has merely a general interest common to all members of the public*.") (emphasis added); see also Winpisinger v. Watson, 628 F.2d 133, 134-39 (D.C. Cir. 1980) (where appellants were candidates for delegate seats at the Democratic National Convention asserting that appellee's conduct had lessened their chances of selection, explaining that "whether an appellant is viewed in the character of a voter, contributor, a noncontributing supporter or a candidate for a delegate post, a court would have to accept a number of very speculative inferences and assumptions in any endeavor to connect his alleged injury with activities attributed to appellees. Courts are powerless to confer standing when the causal link is too tenuous.").

## B. Plaintiff Yang's Removal From the Ballot Does Not Violate the First or Fourteenth Amendments

When considering whether a state election law infringes a constitutional right, courts apply

---

[13] Zach Montellaro, *Biden, Sanders reach convention compromise*, POLITICO (Apr. 30, 2020), https://www.politico.com/news/2020/04/30/biden-sanders-convention-delegates-226208 (describing a memo circulated by both campaigns noting that "the campaigns are committed to working together to ensure representation for Sen. Sanders in the New York delegation").

a balancing test derived from Anderson v. Celebrezze, 460 U.S. 780 (1983), and Burdick v. Takushi, 504 U.S. 428 (1992).[14] Under this test, the court must weigh the "'character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments . . . ' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" Burdick, 504 U.S. at 434, quoting Anderson, 460 U.S. at 789. In applying this test, the severity of the restrictions imposed determines the level of review. "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 359 (1997) (internal quotations omitted). "Under this balancing test, the State's reasonable and nondiscriminatory restrictions will generally be sufficient to uphold the statute if they serve important state interests. Review in such circumstances will be quite deferential, and we will not require elaborate, empirical verification of the weightiness of the State's asserted justifications. Nonetheless, where the burden imposed by the law is non-trivial, we must weigh the State's justification against the burden imposed." Price v. New York State Bd. of Elections, 540 F.3d 101, 109 (2d Cir. 2008) (internal citations omitted).

Here, the magnitude of the burden on Plaintiffs is minimal. It is critical to define the affected interest with precision. The interest in question is that of a former candidate who is no longer seeking or campaigning for a nomination to have his name on the ballot in a party primary election. To the extent it is an injury at all for the purposes of standing, the fact that Plaintiff Yang

---

[14] As set forth above, Plaintiffs' state law claims, including claims arising under the New York State constitution, are barred by the Eleventh Amendment. In any event, this same standard would apply to Plaintiffs' New York State constitutional claims. See, e.g., Walsh v. Katz, 17 N.Y.3d 336, 344 (2011) (applying the Anderson test to a challenge brought pursuant to both the federal and state equal protection clauses).

will no longer appear on a ballot for a nomination he no longer seeks, and for which he officially ended his campaign months ago, constitutes a minimal burden for the purposes of the Anderson-Burdick balancing test.  Notably, "[c]andidacy is not a fundamental right in our political system, and not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates." Fulani v. McAuliffe, 2005 WL 2276881, at *3 (S.D.N.Y. Sept. 19, 2005), citing Clements v. Fashing, 457 U.S. 957, 963 (1982). With respect to the other plaintiffs, their interest in running for the position of delegate to the Democratic National Convention is no greater, as the candidate to whom they were pledged is no longer seeking the nomination. As an initial matter, there is no constitutional requirement that a primary election must be held to select a party's nominee. See New York State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 206 (2008) ("Selection by convention has never been thought unconstitutional, even when the delegates were not selected by primary but by party caucuses."). Indeed, it is ultimately the Democratic Party – not the State Board – that selects which delegates will ultimately represent New York at the National convention.  See Brehm Decl.  ¶¶ 28-38.  It is therefore not inherently burdensome for a candidate and his prospective delegates if a primary is not held, nor is it inherently burdensome for the candidate's prospective voters. Similarly, there is no burden for a candidate who has dropped out of the election to be excluded from the ballot. A candidate who has indicated that they are no longer seeking the nomination cannot credibly claim to have been burdened by their removal for the ballot, nor are the voters who may have voted for that candidate burdened by the inability to support a candidate who was no longer seeking election.  Thus, any burden is minimal, at best.[15]

_____

[15] Plaintiffs suggest that their First Amendment rights were violated because they were removed from the ballot solely on the basis of the content of their speech, but this is inaccurate.  Suspending one's campaign is an *action*, and removal from the ballot was based on the occurrence of that

Further, any such minimal burden does not discriminate against Plaintiffs or their prospective voters. Plaintiffs' suggestion that the State Board arbitrarily cancelled only the Democratic Presidential Primary is factually and legally erroneous—in fact *all* elections that did not need to occur on June 23, 2020 were delayed or cancelled.  Multiple special elections for state legislative offices, borough president offices, and New York City Council positions previously scheduled to be held on June 23, 2020 were cancelled, in favor of electing those officers at the November general election.  See Executive Order 202.23. Village and school board elections were cancelled as well.  See Executive Order 202.13.  The *only* elections still scheduled to proceed on June 23, 2020 are those necessary to decide *contested* party nominations.[16]  Brehm Decl. ¶ 50.

---

action, not any speech accompanying that action.  For example, Plaintiff Yang notified the Federal Election Commission that he was "no longer an active candidate." https://docquery.fec.gov/dcdev/fectxt/1388101.txt.  See, e.g., Rumsfeld v. Forum for Acad. & Institutional Rights, Inc., 547 U.S. 47, 66 (2006) ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into "speech" simply by talking about it.").

[16] Nor were Plaintiffs' procedural due process rights violated. The relevant provisions of Election Law § 2-122-a(13) were passed by the New York State Legislature on April 3, 2020, giving the candidates ample notice of their potential removal from the ballot. The April 27, 2020 meeting of the Democratic commissioners of the Board of Elections was publicly noticed and reported on in advance, and all former candidates were provided notice of the meeting at least five days in advance.  Brehm Decl. ¶¶ 20-25.  Any candidates who wished to remain on the ballot had ample opportunity to inform BOE that they were reactivating their campaign; none did so (and notably, the last remaining challenger, Senator Bernie Sanders, suspended his campaign *after* this law was passed, and thus cannot claim to be unaware of the possibility that the candidate would be dropped from the ballot).  Moreover, review of former candidates' removal from the ballot would have been available through a special proceeding pursuant to Election Law § 16-102, which provides for emergency state judicial proceedings challenging BOE ballot access determinations. Dekom v. Nassau Cty., 595 F. App'x 12, 14 (2d Cir. 2014) ("As we held in Rivera–Powell v. N.Y.C. Board of Elections, 470 F.3d 458 (2d Cir. 2006), New York Election Law § 16–102 provides an adequate post-deprivation remedy for random and unauthorized deprivations of due process in disputes over failure to list a candidate's name on the ballot in a New York election."); see also Weinberger v. Town of Fallsburg, 2019 WL 481733, at *6 (S.D.N.Y. Feb. 6, 2019), aff'd, 2020 WL 1862304 (2d Cir. Apr. 14, 2020) ("Where there is the necessity of quick action by the State, or where providing any meaningful predeprivation process would be impractical, the Government is relieved of the usual obligation to provide a predeprivation hearing.", citing Elsmere Park Club, L.P. v. Town of Elsmere, 542 F.3d 412 (3d Cir. 2008).

As the alleged burden on plaintiffs is minimal as well as "reasonable and nondiscriminatory," Timmons, 520 U.S. at 359, deferential review must be applied to the duly enacted state law that permitted the State Board to remove candidates from the ballot who had dropped out of the race, which resulted in the cancellation of an uncontested primary election. Under rational basis review of a state election law, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." Timmons, 520 U.S. at 359  That is certainly the case here.  However, *any* standard of review is easily satisfied in light of the State's compelling and overriding interest in protecting public health.

In this case, New York's interests in not holding an uncontested election go far beyond merely "important."  While there is obviously no recent direct comparator to a global pandemic, state and federal courts have left no doubt that combating threats to public health is a compelling government interest.  E.g. Ware v. Valley Stream High Sch. Dist., 75 N.Y.2d 114, 128 (1989) ("As a blanket proposition, the State has a compelling interest in controlling AIDS, which presents a public health concern of the highest order."); Workman v. Mingo Cty. Bd. of Educ., 419 F. App'x 348, 353 (4th Cir. 2011) (in upholding a state law requiring vaccinations for attendance at public schools, explaining that "the state's wish to prevent the spread of communicable diseases clearly constitutes a compelling interest"), cert. denied, 565 U.S. 1036 (2011); V.D. v. State of N.Y., 403 F. Supp. 3d 76, 87 (E.D.N.Y. 2019) ("The case law clearly establishes that conditioning school enrollment on vaccination has long been accepted by the courts as a permissible way for States to innoculate large numbers of young people and prevent the spread of contagious diseases . . . and such legislation is supported by a state's strong interests in protecting the public health and welfare.") (internal citations omitted). The State's interest in addressing the COVID-19 pandemic is as compelling a governmental interest as we may ever see.  Legacy Church, Inc. v. Kunkel, 2020

17

WL 1905586, at *40 (D.N.M. Apr. 17, 2020) ("[A] global pandemic and its local outbreak amount to a compelling state interest.").  As such, the State has an overriding interest in protecting its citizens during the current pandemic that would withstand any level of review.  Tolle v. Northam, No. 1-20-CV-363(LMB)(MSN), 2020 WL 1955281, at *1 (E.D. Va. Apr. 8, 2020) ("Granting plaintiff's motion for injunctive relief at this time would also disserve the public interest, because enabling large groups to gather… without practicing social distancing . . . could facilitate the spread of the virus and endanger the lives of many Virginians[.]").  Health authorities across the country and world have emphasized the critical importance of minimizing social contact as a necessary tool to combating the pandemic, and indeed numerous courts across the nation have observed the government's compelling interest in stemming the spread. E.g. Friends of DeVito v. Wolf, 2020 WL 1847100, at *24 (Pa. April 13, 2020) ("There is no question that the containment and suppression of COVID-19 and the sickness and death it causes is a substantial governmental interest."). That preventing the spread of the COVID-19 pandemic is a government interest of the highest priority cannot reasonably be challenged.  The removal of withdrawn candidates from the ballot to avoid an uncontested primary election so resources can be directed towards the challenges of holding contested elections during this public health crisis is manifestly narrowly tailored to promote the state's interest in protecting the health of its populace.[17]

---

[17] Other potential methods of avoiding an in-person primary, such as permitting voting only by mail, present major logistical complications that the State could reasonably have determined could not be surmounted in the available time.  See, e.g., Michael Wines, *Voting by Mail Could Be What States Need. But Can They Pull It Off?*, NEW YORK TIMES (Apr. 11, 2020), https://www.nytimes.com/2020/04/11/us/coronavirus-voting-by-mail-elections.html  (explaining the difficulties and risk of voting entirely by mail). Moreover, even with large-scale absentee or distance voting, election staff would still need to risk their lives to come to work to count ballots and certify results.

### C.  Election Law § 2-122-a(13) is Not an *Ex Post Facto* Law or a Bill of Attainder

Plaintiffs additionally argue that Election Law § 2-122-a(13) constitutes an *ex post facto* denial of Plaintiffs' rights and/or a bill of attainder, but this is plainly not the case, as these doctrines relate specifically to criminal punishment.

The *ex post facto* clause of the Constitution has long been understood to refer only to criminal matters, not civil ones.  See, e.g., Calder v. Bull, 3 U.S. 386, 399 (1798) ("[I]n the present instance, the act or resolution of the Legislature of Connecticut, cannot be regarded as an ex post facto law; for, the true construction of the prohibition extends to criminal, not to civil, cases."); DeMartino v. Comm'r, 862 F.2d 400, 409 (2d Cir. 1988) ("Nor was the 1986 amendment violative of the ex post facto clause of the Constitution, as this is a civil, not a criminal case."). "A constitutionally proscribed bill of attainder is a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." Consol. Edison Co. of New York v. Pataki, 292 F.3d 338, 346 (2d Cir. 2002), citing Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 468 (1977).  In either case, "[t]o show that an act is an *ex post facto* law or a bill of attainder, the act must be validly characterized as punishment in the constitutional sense." Scheidel v. United States, 2010 WL 3880873, at *3 (N.D.N.Y. Sept. 28, 2010), citing Flemming v. Nestor, 363 U.S. 603, 613 (1960).

Here, the removal of a withdrawn candidate from the primary ballot is manifestly not a "punishment" in any sense, nor has there been any legislative determination of "guilt." The primary is uncontested, and Plaintiff Yang has expressly endorsed the sole remaining candidate. The *ex post facto* and bill of attainder doctrines are manifestly inapplicable to this matter.[18]

---

[18] Nor did the members of the State Board improperly apply Election Law § 2-122-a(13) retroactively. The statute, passed against the backdrop of the COVID-19 pandemic, was clearly intended by the Legislature to negate the need to hold uncontested primary elections. In any event,

As Plaintiffs will not be able to demonstrate that their constitutional rights have been violated, they have not satisfied the requirement that there be a clear or substantial likelihood of success on the merits, and their motion for a preliminary injunction should be denied.

## III.   PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

Plaintiffs cannot make a strong showing of irreparable harm absent the injunctive relief they seek, which is "the single most important prerequisite for the issuance of a preliminary injunction." Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC, 468 F. App'x 43, 45 (2d Cir. 2012). To satisfy the irreparable harm requirement, a plaintiff "must demonstrate that absent a preliminary injunction [he or she] will suffer an injury that is neither remote nor speculative, but actual and imminent . . . ." Seifullah v. City of N.Y., 2017 WL 4339478, at *1 (E.D.N.Y. Sept. 27, 2017), quoting Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) and citing Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007); see also Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction) (emphasis in original).

Here, the primary harm asserted is Plaintiff Yang not being on a ballot for a nomination for which he is no longer running, and for which he has conceded he would not win and has endorsed the only remaining candidate.  Brehm Decl. ¶ 8.  The outcome of the election is, by Plaintiff Yang's own admission (and the admission of the other withdrawn candidates), not in

---

this is a question of state law, and cannot be addressed by a federal court pursuant to Eleventh Amendment immunity, even under the Ex Parte Young exception. See Kelly, 632 F. App'x at 18. Even if consideration of the proper interpretation of this state law was not barred by the Eleventh Amendment, it would be appropriate for the Court to abstain from considering this question pursuant to Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 500 (1941), which counsels that federal courts should not adjudicate the constitutionality of a state law until the state courts have had the opportunity to consider them.

doubt, and this harm is therefore negligible. The other alleged harms that stem from this are all, at best, remote and speculative. Plaintiffs cite various concerns relating to lower turnout for other races,[19] ambiguity regarding the distribution of delegates at the Democratic National Convention,[20] precedent for the potential cancellation of the general presidential election, and obstacles to unity within the Democratic Party.  Any harm cited by the plaintiffs with respect to the allocation of delegates to the Democratic National Convention is a function of the rules and procedures of the Democratic Party—such harm is not a constitutional injury and is not the sort of irreparable harm that could support an injunction here. Indeed, all of plaintiffs' claimed harms are, by their very nature, "remote and speculative," and are not the types of actual, imminent injury that a mandatory preliminary injunction is intended to address.

Fundamentally, the only cognizable "actual and imminent" harm that could exist here is

---

[19] This alleged harm is particularly illusory, as New York's Democratic Primary was originally scheduled for April 28, 2020, while the "down-ballot" state legislative and congressional primaries were originally scheduled for June 23, 2020.  On March 28, 2020, the Democratic Primary was rescheduled for June 23, 2020.  See Executive Order No. 202.12.  Holding the Democratic Primary and the down-ballot primaries on the same date was only briefly the intended schedule. It cannot fairly be said that returning to the previous status quo, of the down-ballot primaries being held without an accompanying presidential primary, constitutes any sort of "harm."

[20] The cancellation of the Democratic Presidential Primary does not mean that Vice President Biden will be awarded all of New York's delegates. Rather, the State Democratic Party will propose an allocation of delegates to the Democratic National Committee. The state Democratic Party has publicly expressed that it will work with the Biden and Sanders campaigns to reach a fair allocation, and the Biden and Sanders campaigns have mutually agreed to work to ensure this result. See, e.g., Rebecca C. Lewis, *NY Democratic presidential primary cancelled*, CITY & STATE NEW YORK (Apr. 27, 2020), https://www.cityandstateny.com/articles/politics/news-politics/ny-democratic-presidential-primary-canceled.html ("[Jay Jacobs, chairman of the state Democratic Party] told City & State that he would like to work with both the Biden and Sanders campaigns to find a way to fairly allocate delegates to both candidates. 'The whole purpose of what we did is not political, it's health-related,' Jacobs said. 'It wasn't to cut out all of Bernie Sanders' delegates, that was never the intention.'"); Zach Montellaro, *Biden, Sanders reach convention compromise*, POLITICO (Apr. 30, 2020), https://www.politico.com/news/2020/04/30/biden-sanders-convention-delegates-226208 (describing a memo circulated by both campaigns noting that "the campaigns are committed to working together to ensure representation for Sen. Sanders in the New York delegation").

the damage to plaintiff Yang's and his prospective delegates' prospects of winning the nomination. However, because plaintiff Yang conceded months ago that he would not win the nomination and has withdrawn his candidacy, no such harm actually exists. Thus, plaintiffs' claims for injunctive relief fail and must be denied.

## IV.   THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR THE MEMBERS OF THE STATE BOARD

Finally, the balance of the equities and the consideration of the public interest decidedly weigh in favor of the members of the State Board.

Even if Plaintiffs were able to establish a clear or substantial likelihood of success on the merits and an actual, irreparable injury (and they cannot), they still would not be entitled to a preliminary injunction.  "As the Supreme Court reaffirmed in Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008), a plaintiff seeking a preliminary injunction must demonstrate not just that they have some likelihood of success on the merits and will suffer irreparable harm absent an injunction, but also that the 'balance of the equities tips in his favor and an injunction is in the public interest.'" Otoe-Missouria Tribe, 769 F.3d at 112 n.4. "These factors merge when the Government is the opposing party." Make the Rd. New York v. Cuccinelli, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019), citing Nken v. Holder, 556 U.S. 418, 435 (2009). "In assessing these factors, the court must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction." Make the Road, 419 F. Supp. 3d at 665. In election cases in particular, "where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief." Reynolds v. Sims, 377 U.S. 533, 585 (1964).

In making a determination as to the equities, a court may only issue an injunction if the

balance of hardships tips in the plaintiff's favor. <u>Salinger v. Colting</u>, 607 F.3d 68, 80 (2d Cir. 2010), citing <u>Winter</u>, 555 U.S. at 20 and <u>eBay, Inc. v. MercExchange</u>, 547 U.S. 388, 391 (2006). Further, the court must ensure that the "public interest would not be disserved" by the issuance of a preliminary injunction. <u>Salinger</u>, 607 F.3d at 80 (citing <u>eBay</u>, 547 U.S. at 391). In exercising their discretion in whether to enter an injunction, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." <u>New York State Rifle & Pistol Ass'n v. City of N.Y.</u>, 86 F. Supp. 3d 249, 258 (S.D.N.Y. 2015), <u>aff'd sub nom.</u> <u>New York State Rifle & Pistol Ass'n, Inc. v. City of N.Y.</u>, 883 F.3d 45 (2d Cir. 2018) (quoting <u>Weinberger v. Romero–Barcelo</u>, 456 U.S. 305, 312 (1982)). This includes the government's interest in public health. <u>Million Youth March, Inc. v. Safir</u>, 155 F.3d 124, 125–26 (2d Cir. 1998) (modifying injunction because District Court failed to consider government's interest in, inter alia, public health against First Amendment rights) and <u>Standard & Poor's Corp. v. Commodity Exchange, Inc.</u>, 683 F.2d 704, 711 (2d Cir. 1982) (whether the relief sought is in the public interest is a factor to be considered.).

Here, the balance of equities tips decidedly in the State Board members' favor. Plaintiffs' asserted interests as a withdrawn candidate and his prospective delegates are minimal.  On the other hand, as discussed previously, the state has an extraordinary interest in protecting the public health of its populace, and in light of the ongoing COVID-19 pandemic the effect of an injunction would be severe.  There is currently no election scheduled to be held on June 23, 2020, anywhere in seven counties, eleven others would have political subdivisions with no elections and in total the election footprint is reduced in 35 counties.  Brehm Decl. ¶¶ 40-41.  Reversing the cancellation of the Democratic Presidential Primary would require election staff to be recruited and trained in those counties, and would result in some number of voters engaging in in-person voting (for an

uncontested election) on that date. In total, rescheduling the election would require 615 additional poll sites open for 15 hours each, 22 additional early voting sites open for 60 hours each, 4,617 additional poll workers (a population heavily comprised of persons in categories particularly vulnerable to COVID-19).  Brehm Decl. ¶¶ 41, 45-46.

In addition, given the efforts to increase the ability of voters to use absentee ballots, local election officials are already finding their resources strained.  Brehm Decl. ¶¶ 47-54.  An injunction directing that an uncontested Democratic Presidential Primary go forward threatens to push these efforts to the brink, potentially imperiling the ability of local election officials to send out ballots, count returns, and issue timely results in those primary races that are actually contested.

In the midst of the current emergency, this needless public activity would have real-world health consequences for those election workers, voters, and all those with whom they come in contact with. The potential danger was all-too-tragically illustrated by the recent presidential primary election in Wisconsin, where holding an in-person primary election that the state's governor had proposed to hold via mail resulted in an indeterminate number of avoidable COVID-19 cases.[21] Given New York State's unfortunate status as the United States' center of the pandemic, this danger is particularly acute, and the balance of the equities clearly weighs against subjecting poll workers and voters to unnecessary public contact through an uncontested election.

## CONCLUSION

For the reasons set forth above, the State Board members respectfully requests that the Court deny Plaintiffs' application for emergency relief in its entirety, together with such other relief as the Court may grant.

---

[21] E.g. Scott Bauer, *52 who worked or voted in Wisconsin election have COVID-19*, ASSOCIATED PRESS, https://apnews.com/6428674bc2668ebd2db3c482f7f703c1.

Dated:  New York, New York
        May 1, 2020

**LETITIA JAMES**
Attorney General
State of New York
*Attorney for State Defendants*

By: /s/ Matthew L. Conrad
    MATTHEW L. CONRAD
    Assistant Attorney General
    28 Liberty Street
    New York, NY 10005
    (212) 416-8610