UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANDREW YANG, JONATHAN HERZOG,
HELLEN SUH, BRIAN VOGEL, SHLOMO
SMALL, ALISON HWANG, KRISTEN
MEDEIROS, and DR. ROGER GREEN,
individually and on behalf of all others similarly
situated,

                                    Plaintiffs,

                -against-

DOUGLAS A. KELLNER, Co-Chair and
Commissioner, ANDREW SPANO, Commissioner,
PETER S. KOSINSKI, Co-Chair and Commissioner,
TODD D. VALENTINE, Co-Executive Director, and
ROBERT A. BREHM, Co-Executive Director,
individually and in their official capacities at the New
York State Board of Elections, and THE NEW YORK
STATE BOARD OF ELECTIONS,

                                    Defendants.
_____

GEORGE ALBRO, PENNY MINTZ, JAY
BELLANCA, TRACI STRICKLAND, EMILY
ADAMS, NESTOR MEDINA, SIMRAN
NANDA, KATHRYN LEVY, JOSHUA
SAUBERMAN, CARI GARDNER, STEPHEN
CARPINETA, NANCY DEDELVA, and TING
BARROW,

                                    Plaintiff-Intervenors,

                -against-

DOUGLAS A. KELLNER and ANDREW
SPANO, as Commissioners of the New York
State Board of Elections, and the NEW YORK
STATE BOARD OF ELECTIONS,

                                    Defendants.
_____

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  5/5/2020

20 Civ. 3325 (AT)

**OPINION**
**AND ORDER**

ANALISA TORRES, District Judge:

        In this action, Plaintiffs, Andrew Yang, a Democratic Party presidential candidate who

has suspended his campaign, and Jonathan Herzog, Hellen Suh, Brian Vogel, Shlomo Small,

Alison Hwang, Kristen Medeiros, and Roger Green, Yang's pledged delegates, allege, among other claims, that their rights under the First and Fourteenth Amendments to the United States Constitution were violated when, on April 27, 2020, their names were removed from the New York Democratic presidential primary ballot and the primary was canceled.  *See* Compl., ECF No. 20.

Plaintiffs move, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for a temporary restraining order and preliminary injunction enjoining Defendants, Douglas A. Kellner, Andrew Spano, Peter S. Kosinski, Todd D. Valentine, and Robert A. Brehm, in their individual and official capacities (the "BOE Officials"), and the New York State Board of Elections (the "BOE"), from "cancelling the June 23, 2020 Democratic [p]residential [p]rimary," ECF No. 1-11, and directing the "reinstat[ement]" of "all duly qualified candidates . . . [to] the ballot."  Compl. at 30; *see also* ECF No. 1-11.  Plaintiff-Intervenors, George Albro, Penny Mintz, Jay Bellanca, Traci Strickland, Emily Adams, Nestor Medina, Simran Nanda, Kathryn Levy, Joshua Sauberman, Cari Gardner, Stephen Carpineta, Nancy de Delva, and Ting Barrow, join in this request for emergency relief.  ECF No. 30; *see* Intervenor Compl., ECF No. 29-2.

## BACKGROUND

I.    The New York Democratic Presidential Primary

The 2020 Democratic National Convention (the "Convention") is scheduled to be held in Milwaukee, Wisconsin, from August 17 to 20, having been postponed from July 13 to 16 due to the COVID-19 pandemic.  Compl. ¶ 58.  Under the New York Democratic Party's delegate selection rules, a candidate for the presidency may send delegates to the Convention if he or she receives at least 15 percent of the vote in a congressional district, and 15 percent of the vote statewide.  *See* 2020 New York State Delegate Selection Plan (the "Delegate Selection Plan")

§ III(A)(3) ("One Hundred Eighty-four (184) pledged delegates shall be elected from [c]ongressional [d]istricts in the [p]rimary."), ECF No. 27-6; *id.* § II(A)(3) ("[A]ll pledged delegates and alternates shall be allocated among the [p]residential [c]andidates in proportion to the votes such [c]andidates receive in the [p]rimary, except that a [p]residential [c]andidate who fails to receive the 15% threshold percentage of the vote in the applicable unit of representation shall not receive any delegates or alternates from that unit, and further provided that a [p]residential [c]andidate who fails to receive the 15% threshold percentage of the vote statewide shall not receive any delegates or alternates.").

Although the "basic purpose of the [C]onvention is to select the [p]residential nominee," the Convention "also serves to determine the party's principles and goals through the adoption of a platform."  17 A.L.R. 7th Art. 7 § 2 (2016); *see also* Compl. ¶ 58; Intervenor Compl. ¶ 37. Delegates play a pivotal role in this process by casting "votes on platform issues and issues of party governance."  *Rockefeller v. Powers* (*Rockefeller I*), 74 F.3d 1367, 1380 (2d Cir. 1995); *see also* Democratic National Convention 2020, https://www.demconvention.com ("In addition to fulfilling their nominating duties, Democratic Party members from across the country will also work together during the convention to adopt the official 2020 Democratic Party platform."); *Call for the 2020 Democratic National Convention* Art. VII(B)(1), Democratic National Committee (Aug. 25, 2018), https://democrats.org/wp-content/uploads/sites/2/2019/07/2020-Call-for-Convention-with-Attachments-2.26.19.pdf ("The members of the standing committees [on platform, rules, and credentials] allocated to the states and territories shall be elected by each state's [n]ational Convention delegates . . . .").[1]

---

[1] Most delegates—approximately 85 percent of them—at the Convention are "pledged" delegates, who are "required to vote for a particular candidate at the Convention based on the result of their state's (or territory's) primary election, caucus, or convention," as opposed to "unpledged" delegates, otherwise known as "superdelegates," "who may vote for the candidate of their choice."  *Kurzon v. Democratic Nat'l Comm.*, 197 F. Supp. 3d 638, 641

As part of the state primary process, the BOE received petitions that qualified eleven presidential candidates, and several slates of delegates pledged to those candidates, to be on the New York Democratic presidential primary ballot, which was originally set for April 28, 2020. April 27 Resolution, ECF No. 27-2; Brehm Decl. ¶¶ 2–3, ECF No. 27.  Over the course of February, March, and April, however, ten out of the eleven presidential contenders "publicly announced that they are no longer seeking the nomination for the office of president of the United States, or that they are terminating or suspending their campaign."  April 27 Resolution at 1; Brehm Decl. ¶ 7.

Meanwhile, on March 28, 2020, due to concerns over the safety of conducting the election during the COVID-19 pandemic, New York Governor Andrew M. Cuomo issued an executive order directing that "[a]ny presidential primary to be held on April 28, 2020 . . . be postponed and rescheduled for June 23, 2020."  N.Y. Executive Order 202.12.

On April 3, 2020, Governor Cuomo signed into law Senate Bill S7506B, an omnibus appropriations bill that contained an amendment to New York Election Law § 2-122-a, which concerns procedures for holding elections for delegates "to a national convention or national party conference."  N.Y. Election Law § 2-122-a; *see* S7506B/A9506, 2019–2020 Legislative Session (N.Y. 2020).  Specifically, New York Election Law § 2-122-a was amended to authorize the BOE to "omit . . . from the ballot" any primary candidate for office of the President of the United States when any of three circumstances comes to pass:  first, if the candidate "publicly announces that they are no longer seeking the nomination for [that] office"; second, "if the candidate announces that they are *terminating or suspending* their campaign"; or third, "if the

_____

(S.D.N.Y. 2016) (noting that superdelegates comprise party leadership, including "members of the Democratic National Committee, Democratic members of Congress, and Democratic state governors").  The delegate candidates in this case would serve as pledged delegates if elected.

candidate sends a letter to the state board of elections indicating they no longer wish to appear on the ballot."  N.Y. Election Law § 2-122-a(13) (emphasis added); S7506B/A9506 Part TT § 1. The statute further provides that "for any candidate of a major political party, such determination shall be solely made by the commissioners of the state board of elections who have been appointed on the recommendation of such political party or the legislative leaders of such political party."  *Id.*

On April 27, 2020, BOE Democratic Party Commissioners Kellner and Spano (the "Democratic Commissioners") adopted a resolution (the "April 27 Resolution") invoking their authority under the recently enacted § 2-122-a(13) to remove ten Democratic presidential candidates who had qualified to be on the ballot, but who had suspended their presidential campaigns or announced they were no longer seeking the nomination.  April 27 Resolution. According to the resolution, "pursuant to the public declarations made by the relevant presidential candidates, the following candidates are no longer eligible as a designated Democratic [p]rimary candidate, and their names shall be omitted from the Democratic [p]rimary ballot:  Michael Bennet, Michael Bloomberg, Pete Buttigieg, Tulsi Gabbard, Amy Klobuchar, Deval Patrick, Bernie Sanders, Tom Steyer, Elizabeth Warren, [and] Andrew Yang."  April 27 Resolution.  The only remaining candidate was Joe Biden.  BOE Notice, ECF No. 27-5 at 1.

As a result, the candidates for delegates who were committed to those ten presidential contenders were also removed from the ballot, because New York Election Law § 2-122-a(14) provides that "candidates for delegates and/or alternate delegates who are pledged to candidates of the office of president of the United States who have been omitted pursuant to subdivision thirteen of this section shall also be omitted."  N.Y. Election Law § 2-122-a(14); *see* April 27 Resolution at 1.

New York Election Law § 6-160(2), which applies to all party primary elections in New York, states that when there is only one candidate on the ballot, that candidate "shall be deemed nominated or elected . . . without balloting." N.Y. Election Law § 6-160(2). Accordingly, on April 27, 2020, with all but one candidate removed from the Democratic presidential primary ballot, the election was canceled by operation of law. The BOE's co-executive directors, Robert A. Brehm and Todd D. Valentine, issued an amended certification for the Democratic presidential primary, listing Joe Biden as the sole remaining qualified candidate, and announced that there was "no longer a need for the holding of a Democratic [p]residential [p]rimary election on June 23, 2020." BOE Notice; *see also* Amended Certification, ECF No. 27-5 at 2; *April 27, 2020 New York State Board of Elections Meeting* at 10:44–11:15, New York State Board of Elections (Apr. 28, 2020), https://youtu.be/L7YPeRLw1_Q.

II.    The Parties

Plaintiffs and Plaintiff-Intervenors are all registered New York State Democratic Party voters. Yang Aff. ¶ 2, ECF No. 20-1; Herzog Aff. ¶ 2, ECF No. 20-3; Suh Aff. ¶ 2, ECF No. 20-4; Vogel Aff. ¶ 2, ECF No. 20-5; Small Aff. ¶ 2, ECF No. 20-6; Hwang Aff. ¶ 2, ECF No. 20-7; Medeiros Aff. ¶ 2, ECF No. 20-8; Green Aff. ¶ 2, ECF No. 20-9; Intervenor Compl. ¶¶ 3, 5–14.

Yang was also a Democratic candidate for the presidency. Yang Aff. ¶ 3. He announced that he was suspending his campaign on February 11, 2020. Yang Aff. ¶ 5; Brehm Decl. ¶ 8. Yang states that, by suspending and not terminating his campaign, he "believed and expected that [his] name would nonetheless stay on the ballot in states with upcoming elections," and that it was his "intention and hope that voters would express their preferences by voting in the upcoming elections." Yang Aff. ¶¶ 5–6; Compl. ¶¶ 69, 83.

6

Herzog, Suh, Vogel, Small, Hwang, Medeiros, and Green (the "Yang Delegates"), collected petition signatures for themselves and Yang in order to appear on the New York Democratic presidential primary ballot as Convention delegate candidates pledged to Yang. Herzog Aff. ¶¶ 4–5; Suh Aff. ¶¶ 4–5; Vogel Aff. ¶¶ 4–5; Small Aff. ¶¶ 4–5; Hwang Aff. ¶¶ 4–5; Medeiros Aff. ¶¶ 4–5; Green Aff. ¶¶ 4–5.  They state that they still wish to be elected as delegates.  *Id.*

Albro, Mintz, Bellanca, Strickland, Adams, Medina, Nanda, Levy, Sauberman, Gardner, Carpineta, de Delva, and Barrow (the "Sanders Delegates," who, together with the Yang Delegates, are referred to as "Delegate Plaintiffs"), qualified for, and were placed on, the New York Democratic presidential primary ballot as Convention delegate candidates pledged to Sanders.  Intervenor Compl. ¶¶ 3, 5–14.  They also still wish to be elected as delegates.  *Id.*

III.   Procedural History

On April 28, 2020, Plaintiffs filed their complaint and request for emergency relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.  ECF No. 1.  On May 1, 2020, Plaintiffs filed, with leave of the Court, a second amended complaint to name additional defendants.  *See* Compl.  On May 3, 2020, the Court granted Plaintiff-Intervenors' motion to intervene.  ECF No. 38.  On May 4, 2020, the Court held a telephonic hearing on the request for a preliminary injunction.[2]

---

[2] Because Plaintiffs' and Plaintiff-Intervenors' entitlement to relief is clear from the undisputed record, the Court need not hold an evidentiary hearing before granting a preliminary injunction.  *See Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) ("An evidentiary hearing is not required [to decide a motion for a preliminary injunction] when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case, or when the disputed facts are amenable to complete resolution on a paper record." (citation omitted)); *Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997) (stating that "there is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it," and that "[g]enerally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when essential facts are not in dispute" (internal quotation marks and citations omitted)).

## DISCUSSION

I.    Standing

"Article III, § 2, of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies,' which restricts the authority of federal courts to resolving the legal rights of litigants in actual controversies." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (internal quotation marks and citation omitted).  The "Constitution requires that anyone seeking to invoke federal jurisdiction . . . have standing to do so." *Crist v. Comm'n on Presidential Debates*, 262 F.3d 193, 194 (2d Cir. 2001); *see Genesis Healthcare Corp.*, 569 U.S. at 71 ("In order to invoke federal-court jurisdiction, a plaintiff must demonstrate that he possesses a legally cognizable interest, or personal stake, in the outcome of the action." (internal quotation marks and citation omitted)).  "To satisfy Article III, a party must demonstrate an 'injury in fact'; a causal connection between the injury and the conduct of which the party complains; and that it is 'likely' a favorable decision will provide redress." *Kowalski v. Tesmer*, 543 U.S. 125, 129 n.2 (2004) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Defendants argue that "it is unlikely that any of the [P]laintiffs will be able to demonstrate that they have standing to bring suit."  Def. Opp. at 12, ECF No. 26.  The Court disagrees.

First, Plaintiffs have suffered an "injury in fact." *Kowalski*, 543 U.S. at 129 n.2 (internal quotation marks and citation omitted).  As of March 4, 2020, eleven presidential contenders, including Yang, and delegates pledged to Yang, Sanders, and others, had qualified to be on the Democratic presidential primary ballot.  *See* Sample Ballot, ECF No. 27-7; Brehm Decl. ¶ 3.  On April 27, 2020, the Democratic Commissioners removed Yang and other presidential candidates from the ballot, and, pursuant to New York Election Law § 6-160(2), the BOE announced that the race was canceled.  *See* Compl. ¶ 4.  These actions denied Plaintiffs and Plaintiff-Intervenors

the opportunity to compete for elective office—for Yang, as a presidential candidate, the chance to receive votes that would allow his supporters to go to the Convention, and for Delegate Plaintiffs, the chance to be elected as delegates based on the votes their candidate receives.  It also deprived Plaintiffs and Plaintiff-Intervenors of their opportunity as voters to cast a ballot for the individual who represents their political views.  *Id.* ¶ 89.  Yang's suspension of his campaign does not divest him of standing to challenge his erasure as a primary contender.  Yang suspended his campaign with the understanding that his name would remain on the ballot, *see* Yang Aff. ¶¶ 5–6, which would allow him to accumulate delegates.  Eliminating him as a candidate forecloses a significant means of exercising "influence at the party's [C]onvention."  Compl. ¶ 70.  It does the same for his pledged delegates.  Removing Plaintiffs and Plaintiff-Intervenors from the ballot and canceling the presidential primary denied them the chance to run, and denied voters the right to cast ballots for their candidate and their political beliefs—all of which amount to "actual," "concrete, and particularized" injuries.  *Lujan*, 504 U.S. at 560.

Second, "a causal connection" exists "between the injury and the conduct complained of."  *Id.* (internal quotation mark, alteration, and citation omitted).  It is undisputed that the injury here "is fairly traceable to the" actions of the Democratic Commissioners, *id.* (internal quotation marks, alteration, and citation omitted), because the April 27 Resolution removing the ten presidential candidates and Delegate Plaintiffs from the ballot triggered the cancellation of the primary by operation of law.

Third, the requirement that it be "likely that the injury [will] be redressed by a favorable decision" is also met here.  *Id.* at 561 (internal quotation marks, alteration, and citation omitted).  Plaintiffs' and Plaintiff-Intervenors' injuries would be redressed by the requested relief, which would require the BOE Officials to (1) place Yang and Delegate Plaintiffs back on the ballot,

and (2) hold the presidential primary.  The Court concludes, therefore, that Plaintiffs and

Plaintiff-Intervenors have standing to bring this case.  *See Coal. for a Progressive New York v.*

*Colon*, 722 F. Supp. 990, 993 (S.D.N.Y. 1989) ("[A] candidate for Democratic Party nomination

in the race for the 11th District Council seat, and . . . his campaign manager [who is also] a

registered voter seeking to cast a primary ballot supporting [candidate's] nomination, both

possess the requisite standing to challenge [candidate's] removal from the primary ballot.").

Defendants argue that Delegate Plaintiffs lack standing because "the Democratic

[p]residential [p]rimary election would not actually have determined whether they would, in fact,

serve as delegates" to the Convention.  Def. Opp. at 12.  It is true that the primary election does

not, by itself, determine who will serve as delegates to the Convention.  But the primary is a key

component of the delegate selection process.  Under current rules, a pledged delegate must be on

the primary ballot in order to be eligible to compete for a slot at the Convention.  *See* Delegate

Selection Plan § II(A)(3) ("[A]ll pledged delegates and alternates shall be allocated among the

[p]residential [c]andidates in proportion to the votes such [c]andidates receive in the

[p]rimary.").

New York's Democratic presidential primary is a head-to-head contest between

candidates seeking the nomination of the Democratic Party.  Brehm Decl. ¶ 32.  In other words,

voters are presented with a ballot that asks them to select their preferred candidate for the

presidential nomination.  But those votes do not lead directly to the selection of a nominee.  *Id.*

Instead, the primary votes are tallied and provided to the New York Democratic Party; then,

through a complicated mathematical formula, the state Party determines how many delegates

committed to each candidate should be sent to the Convention.  *Id.*  In essence, if a given

presidential candidate receives more votes, then more delegates pledged to that candidate are entitled to participate in the Convention.  *Id.* ¶ 33.[3]

The process of selecting individual delegates is a complicated one, involving Democratic Party rules and priorities, and it is difficult to know in advance if any individual delegate candidate will make it to the Convention.  *Id.* ¶ 35.  Defendants are correct, therefore, that the Democratic presidential primary election would not have determined whether any of Delegate Plaintiffs would, in fact, serve as Convention delegates.  Def. Opp. at 12.  But under current rules, the only way for *any* New York delegate to participate in the Convention is if their presidential candidate receives a qualifying vote share.  So holding the primary would provide Delegate Plaintiffs with an opportunity—indeed, the *only* opportunity—to compete for the chance to become Convention delegates.  That Delegate Plaintiffs' rights are tied to those of Yang and other presidential candidates does not diminish Delegate Plaintiffs' importance, or their standing to sue when their ability to run—which rises and falls on their presidential candidates' viability—is threatened.

Accordingly, Plaintiffs and Plaintiff-Intervenors have established that they have standing to bring this suit.

## II.     Sovereign Immunity

Under the United States Constitution, states "retain the dignity, though not the full authority, of sovereignty."  *Alden v. Maine*, 527 U.S. 706, 715 (1999).  For that reason, the Eleventh Amendment to the Constitution, incorporating the longstanding doctrine of "sovereign immunity," bars federal lawsuits against a state unless (1) the state unambiguously consents to be

---

[3] It is also possible—though not necessary—for delegates to appear on the ballot in their own name.  Brehm Decl. ¶ 33.  But the votes that the delegates receive for themselves determine only the "order" of delegates within a presidential candidate's slate.  *Id.* ¶ 35.  The number of a candidate's committed delegates that are sent to the Convention is determined *only* by the votes for the presidential candidate.  *Id.* ¶ 33.

sued, or (2) Congress has enacted legislation abrogating the state's Eleventh Amendment immunity. *See, e.g.*, *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54–55 (1996). This immunity extends to "arms of the state, such as state agencies." *Walker v. City of Waterbury*, 253 F. App'x 58, 60 (2d Cir. 2007) (internal quotation marks and citations omitted). Under the rule first established by the Supreme Court in *Ex Parte Young*, 209 U.S. 123 (1908), that bar does not apply to "suits against state officers acting in their official capacities that seek prospective injunctive relief to prevent a continuing violation of federal law." *Kelly v. New York Civil Serv. Comm'n*, 632 F. App'x 17, 18 (2d Cir. 2016). *Ex Parte Young* does not allow a federal court, however, "to issue an injunction for a violation of state law." *Id.* (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)).

Plaintiffs and Plaintiff-Intervenors bring claims against the BOE itself and BOE Officials in both their official and individual capacities. *See generally* Compl.; Intervenor Compl. Because New York has not consented to be sued, and because Congress has not enacted legislation abrogating New York's Eleventh Amendment immunity with regard to Plaintiffs' and Plaintiff-Intervenors' causes of action, the claims against the BOE as a state agency are barred by sovereign immunity. Moreover, the *Ex Parte Young* doctrine does not permit a federal court to issue an injunction for a violation of state law. *See Kelly*, 632 F. App'x at 18.

Accordingly, for the purposes of resolving the request for a preliminary injunction, the Court addresses only prospective injunctive relief against the BOE Officials in their official capacity brought under the U.S. Constitution.

III.   Preliminary Injunction

A.  Legal Standard

A preliminary injunction sought against government action taken pursuant to a statute or regulatory scheme requires that "the moving party . . . demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction."  *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016).  Moreover, the movant must show that "the balance of equities tips in his [or her] favor."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citation omitted).

Where a moving party seeks a mandatory preliminary injunction requiring a change to the status quo, as opposed to a prohibitory preliminary injunction that merely maintains the status quo, the district court "may enter a mandatory preliminary injunction against the government only if it determines that, in addition to demonstrating irreparable harm, the moving party has shown a 'clear' or 'substantial' likelihood of success on the merits."  *Thomas v. New York City Bd. of Elections*, 898 F. Supp. 2d 594, 597 (S.D.N.Y. 2012) (quoting *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006) (internal quotation marks omitted)).  This standard also applies where the injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits."  *People ex. rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks and citation omitted).  Because the Court concludes that Plaintiffs and Plaintiff-Intervenors meet the more rigorous standard, the Court need not decide whether a

13

prohibitory or mandatory injunction is sought here.  *See Green Party of New York State v. New York State Bd. of Elections*, 267 F. Supp. 2d 342, 351 (E.D.N.Y. 2003), *modified*, No. 02 Civ. 6465, 2003 WL 22170603 (E.D.N.Y. Sept. 18, 2003), *and aff'd*, 389 F.3d 411 (2d Cir. 2004).

      B.  Analysis

          1.  Irreparable Harm

To establish irreparable harm, Plaintiffs and Plaintiff-Intervenors "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley*, 559 F.3d at 118 (internal quotation marks and citation omitted).

Plaintiffs and Plaintiff-Intervenors have shown irreparable injury because they face a violation of their constitutional rights.  "All election laws necessarily implicate the First and Fourteenth Amendments." *Gonsalves v. New York State Bd. of Elections*, 974 F. Supp. 2d 191, 197 (E.D.N.Y. 2013) (internal quotation marks and citation omitted).  And where a challenged regulation "governs the registration and qualification of voters, the selection and eligibility of candidates, or the voting process itself, [it] inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Price v. New York State Bd. of Elections*, 540 F.3d 101, 107–08 (2d Cir. 2008) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (internal quotation marks omitted)).

In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm.  *See, e.g.*, *Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury." (internal quotation marks and citations omitted)); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege

deprivation of a constitutional right, no separate showing of irreparable harm is necessary.");
*Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (clarifying that "it is the *alleged* violation of a
constitutional right that triggers a finding of irreparable harm" and a substantial likelihood of
success on the merits of a constitutional violation is not necessary).

Courts in this circuit have consistently found irreparable injury in matters where voters
have alleged constitutional violations of their right to vote.  *See, e.g.*, *Green Party of New York
State*, 267 F. Supp. 2d at 351 ("The plaintiffs have satisfied the [irreparable harm] prong of the
test by alleging" that certain aspects of New York's voter enrollment scheme violated "their First
and Fourteenth Amendment rights to express their political beliefs, to associate with one another
as a political party, and to equal protection of the law."); *Credico v. New York State Bd. of
Elections*, 751 F. Supp. 2d 417, 420 (E.D.N.Y. 2010) (finding irreparable injury where plaintiffs
alleged that the [BOE's] refusal to place a candidate's name on the ballot violated plaintiffs'
First and Fourteenth Amendment rights to "fully express their political association with the
parties or candidates of their choice"); *Dillon v. New York State Bd. of Elections*, No. 05 Civ.
4766, 2005 WL 2847465, at *3 (E.D.N.Y. Oct. 31, 2005) (finding irreparable harm where
"plaintiffs allege[d] violations of their First and Fourteenth Amendment rights of expression and
association and equal protection of the law").

Moreover, Plaintiffs and Plaintiff-Intervenors can clearly establish irreparable injury
because, without Court intervention, the presidential primary will not take place, Plaintiffs,
Plaintiff-Intervenors, and the candidates to whom they are pledged will not appear on the ballot,
and—along with other New York Democratic voters—they will be deprived of the right to cast a
vote for an otherwise qualified candidate and the political views expressed by that candidate.
*See Amarasinghe v. Quinn*, 148 F. Supp. 2d 630, 634 (E.D. Va. 2001) ("It is clear that the

plaintiff in this case meets the burden of showing irreparable injury.  Without an injunction, the . . . election will take place, notwithstanding write-in votes, the plaintiff will not be considered on the ballot by the voters for a seat in the House of Representatives.  Monetary damages . . . would not compensate the plaintiff.").  The Court finds, therefore, that Plaintiffs and Plaintiff-Intervenors have established the threat of irreparable harm absent a preliminary injunction.

### 2.   Likelihood of Success on the Merits

The Court concludes that Plaintiffs and Plaintiff-Intervenors have shown a clear and substantial likelihood of success on the merits of their claim that the Democratic Commissioners' April 27 Resolution removing Yang, Sanders, and eight other Democratic presidential candidates from the ballot deprived them of associational rights under the First and Fourteenth Amendments to the Constitution.

### a.   The Right of Association

Although "administration of the electoral process is a matter that the Constitution largely entrusts to the States," the Supreme Court has long recognized that "unduly restrictive state election laws may so impinge upon freedom of association as to run afoul of the First and Fourteenth Amendments."  *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973).  That includes state laws governing which candidates may appear on the ballot.  Ballot access rules implicate "two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."  *Williams v. Rhodes*, 393 U.S. 23, 30 (1968); *see Bullock v. Carter*, 405 U.S. 134, 143 (1972) ("[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some

theoretical, correlative effect on voters."). "[N]o litmus-paper test will separate valid ballot-access provisions from invalid interactive speech restrictions . . . [b]ut the First Amendment requires [courts] to be vigilant in making those judgments, to guard against undue hindrances to political conversations and the exchange of ideas." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 192 (1999) (internal quotation marks and citations omitted).

That requirement extends to primary elections like the one here. *See New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 204 (2008) ("We have . . . acknowledged an individual's associational right to vote in a party primary without undue state-imposed impediment."). "When a state-mandated primary is used to select delegates to conventions or nominees for office, the State is bound not to design its ballot or election processes in ways that impose severe burdens on First Amendment rights of expression and political participation." *Lopez Torres*, 552 U.S. at 210 (Kennedy, J., concurring in the judgment). The Second Circuit has repeatedly affirmed district court orders striking down unduly burdensome ballot access requirements in primary elections, including presidential primaries. *See, e.g.*, *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 153 (2d Cir. 2000) (invalidating requirement that witnesses for primary ballot access petitions reside in particular congressional district); *Rockefeller v. Powers* (*Rockefeller II*), 78 F.3d 44, 45 (2d Cir. 1996) (affirming district court order reducing number of signatures required to appear on presidential primary ballot). Voters "have an associational right to vote in political party elections, and that right is burdened when the state makes it more difficult for these voters to cast ballots." *Price*, 540 F.3d at 108 (citations omitted). Likewise, "candidates' associational rights are affected, in at least some manner, when barriers are placed before the voters that would elect these candidates to party positions." *Id.*

b.  The *Anderson-Burdick* Framework

In assessing challenges to ballot-access restrictions under the First and Fourteenth
Amendments, courts apply the so-called *Anderson-Burdick* balancing test, derived from two
Supreme Court cases.  In *Anderson v. Celebrezze*, the Supreme Court struck down as
unconstitutional an Ohio law providing that independent candidates could appear on the
presidential general election ballot only if they met the filing requirement by March of the
election year.  460 U.S. at 805–06.  The Court held that when confronted with a restriction on
ballot access, a court must "first consider the character and magnitude of the asserted injury to
the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to
vindicate," then "identify and evaluate the precise interests put forward by the State as
justifications for the burden imposed by its rule," and then "determine the legitimacy and
strength of each of those interests" and "consider the extent to which those interests make it
necessary to burden the plaintiff's rights."  *Id.* at 789.

In *Burdick v. Takushi*, the Supreme Court applied that test to uphold Hawaii's prohibition
on write-in voting in general elections.  504 U.S. 428, 441–42 (1992).  In doing so, the Court
refined the *Anderson* standard, explaining that "the rigorousness of [a court's] inquiry into the
propriety of a state election law depends upon the extent to which a challenged regulation
burdens First and Fourteenth Amendment rights."  *Id.* at 434.  "[W]hen those rights are subjected
to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of
compelling importance'"—in other words, the restriction must survive the standard commonly
referred to as "strict scrutiny."  *Id.* (citation omitted).  "But when a state election law provision
imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth
Amendment rights of voters, the State's important regulatory interests are generally sufficient to

18

justify the restrictions." *Id.* (internal quotation marks and citation omitted).  If a restriction is not "severe," then "the State's reasonable and nondiscriminatory restrictions will generally be sufficient to uphold the statute if they serve important state interests." *Price*, 540 F.3d at 109.

In sum, therefore, this Court must *first*, examine the extent to which the April 27 Resolution (and the consequent cancellation of the presidential primary) impose on Plaintiffs' and Plaintiff-Intervenors' (1) opportunity to appear on the ballot as candidates, and (2) right to support candidates as *voters*, and decide whether Defendants' actions qualify as "severe" or "reasonable, nondiscriminatory" restrictions, and *second*, consider the legitimacy and strength of the rationale put forward by Defendants, and determine whether it justifies the extent of the burden on Plaintiffs' and Plaintiff-Intervenors' rights under the applicable framework.

### c.   The Burden on First and Fourteenth Amendment Rights

The New York Democratic Party has opted to conduct the selection of delegates to the Convention through a primary held under New York State law.  *See* Delegate Selection Plan § II(A)(3) ("[A]ll pledged delegates and alternates shall be allocated among the [p]residential [c]andidates in proportion to the votes such [c]andidates receive in the [p]rimary[.]").  The Democratic Commissioners, acting pursuant to § 2-122-a(13), the statute empowering the BOE commissioners of a given political party to eliminate candidates who have suspended their campaign or announced that they are no longer seeking the presidency, removed Yang, Sanders, and the other presidential contenders from the primary ballot because they suspended their campaigns, or announced that they were no longer seeking the presidency.  April 27 Resolution at 1–2; Compl. ¶ 66.  Section 2-122-a(13) may reflect reasonable policy objectives in the abstract, and the Court need not assess its facial validity to decide this case.  *See Field Day, LLC v. Cty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006) ("A 'facial challenge' to a statute considers

only the text of the statute itself, not its application to the particular circumstances of an

individual.  An 'as-applied challenge,' on the other hand, requires an analysis of the facts of a

particular case to determine whether the application of a statute, even one constitutional on its

face, deprived the individual to whom it was applied of a protected right." (citations omitted)).

As the statute was applied here, however, it upended the candidates' settled expectation that they

would stay on the ballot; after all, when Yang and the other contenders suspended their

campaigns, there was no threat that doing so would bar them from competing for

delegates.  Compl. ¶ 69; Yang Aff. ¶¶ 6, 12.  Thus, the question presented is what burden was

imposed on Plaintiffs' and Plaintiff-Intervenors' associational rights as candidates, and as voters,

when (1) the Democratic Commissioners removed ten presidential candidates from the primary

ballot, (2) they did so based on a statute enacted after a number of contenders had already

announced that although they were suspending their campaigns, they intended to stay on the

ballot, and (3) prior rules and practice would have permitted their names to remain on the roster

of primary candidates.

Defendants argue that the burden on Plaintiffs' and Plaintiff-Intervenors' rights is

minimal, because "[t]he interest in question is that of a former candidate who is no longer

seeking or campaigning for a nomination to have his name on the ballot in a party primary

election," and that of his or her pledged delegates.  Def. Opp. at 14.  At first glance, it may be

difficult to see what interest candidates or voters have in participating in an election where only

one politician is actively pursuing the office at stake, with the stated support of every other

candidate; after all, the function of the election process is "to winnow out and finally reject all

but the chosen candidates, not to provide a means of giving vent to short-range political goals,

20

pique, or personal quarrels." *Burdick*, 504 U.S. at 438 (internal quotation marks, citation, and alterations omitted).

But that impression falls away upon closer examination.  Although the names of the various presidential candidates are the ones that appear on the ballot, the primary actually results in the election of delegates to the Convention.  In *Rockefeller I*, 74 F.3d at 1379–80, the Second Circuit explained that even though New York's primary system is "seen widely as a unitary state presidential primary," the primary in fact consists of a set of separate elections in each congressional district for *delegates*:

> Although popular attention may well focus on the number of delegates pledged to each candidate at the convention, *the delegates themselves will also cast votes on platform issues and issues of party governance*.  No doubt, the chief purpose of many voters will be to send a message on presidential candidates.  But that does not mean that we must treat these . . . elections as if they were a straw poll.  In short, registered [party members] in each district will be electing a slate of . . . people who are pledged to vote for a particular candidate, who may be freed to vote for anyone, and who will vote at the convention on other issues as well.

*Id.* at 1380 (emphasis added).

As a consequence, the removal of presidential contenders from the primary ballot not only deprived those candidates of the chance to garner votes for the Democratic Party's nomination, but also deprived their pledged delegates of the opportunity to run for a position where they could influence the party platform, vote on party governance issues, pressure the eventual nominee on matters of personnel or policy, and react to unexpected developments at the Convention.  And it deprived Democratic voters of the opportunity to elect delegates who could push their point of view in that forum.  Delegate Plaintiffs, who had planned to compete in the primary, express a strong continuing interest in doing so if given the chance, and affirm that they have made significant personal sacrifices for the opportunity.  Compl. ¶¶ 6, 56, 59; *see* Herzog

Aff. ¶¶ 4–5; Suh Aff. ¶¶ 4–5; Vogel Aff. ¶¶ 4–5; Small Aff. ¶¶ 4–5; Hwang Aff. ¶¶ 4–5;

Medeiros Aff. ¶¶ 4–5; Green Aff. ¶¶ 4–5; *see also* Mativetsky Aff. ¶¶ 4–5 (non-party candidate

for delegate discussing similar desire and effort to participate in election); Gluck Aff. ¶¶ 5

(same); Intervenor Compl. ¶¶ 3, 5–14.

Of course, those opportunities would have also been lost if Yang or Sanders had taken

formal action to remove himself from the ballot under existing law.  *See* N.Y. Election Law § 6-

146(1) ("A person designated as a candidate for nomination or for party position . . . may, in a

certificate signed and acknowledged by him, and filed as provided in this article, decline the

designation or nomination."); *id.* § 2-122-a(2) (applying § 6-146 to presidential primaries).  But

Yang states that he did not take those steps, with the goal of allowing his supporters to express

their views and influence the Convention by voting for him in the New York primary.  Compl.

¶ 78; Yang Aff. ¶¶ 6, 8.  Sanders, too, did not formally remove his name from the ballot.  And

although delegates are Democratic Party offices selected according to party rules, Brehm Decl.

¶¶ 29, 32, neither the New York nor the national Democratic Party has amended the Delegate

Selection Plan, which provides that delegates will be allocated based on the results of the

primary election conducted by the state.  *See* Delegate Selection Plan § II(A)(3).

Notwithstanding Delegate Plaintiffs' desire to compete for delegate spots, and ability to

do so under Democratic Party rules, the April 27 Resolution and cancellation of the primary

ruined their chances.  It also eliminated the opportunity for voters to express their political views

by supporting Delegate Plaintiffs.  Def. Opp. at 14–15.  The Democratic Commissioners'

adoption of the April 27 Resolution, which was authorized by a provision of law that was not in

force at the time the candidates made their decisions to suspend their campaigns, imposed a

substantial burden on Plaintiffs' and Plaintiff-Intervenors' right to "associate for the

advancement of political beliefs," and on the voters' right "to cast their votes effectively." *Williams*, 393 U.S. at 30.  The Court ultimately need not determine whether this burden was so severe that strict scrutiny is warranted, because even under the more lenient balancing test for "reasonable and nondiscriminatory restrictions," *Price*, 540 F.3d at 109, Defendants' justifications cannot support their weighty imposition on Plaintiffs' and Plaintiff-Intervenors' right to free association.

d.  State Justifications

The April 27 Resolution removing the ten presidential contenders from the primary ballot did not provide a reason for the action, beyond stating that candidates had "publicly announced that they are no longer seeking the nomination for the office of president of the United States, or that they are terminating or suspending their campaign."  April 27 Resolution at 1.  Defendants argue that removing Yang, Sanders, and the others from the ballot, and canceling the presidential primary, is necessary to combat the public health risk posed by COVID-19.  Def. Opp. at 17–18. They stress that minimizing social contact is the most important tool available for preventing the spread of the virus.  *Id.* at 18.  And they maintain that holding the presidential primary will dramatically increase the possibility of social contact, for two reasons.  First, in a number of localities, the presidential primary was the only election scheduled for June 23.  Robert A. Brehm, co-executive director of the BOE, states that if the primary does not take place, the need to hold an election would be eliminated to some extent in jurisdictions located in 35 counties statewide; seven counties would have no elections at all on June 23, and municipalities within 11 other counties would have no elections.  Brehm Decl. ¶ 40.  Second, even where other elections are scheduled for June 23, canceling the presidential primary might reduce the number of voters for whom an election is held, as well as the quantity of voters interested in turning out.  *See id.*

All told, Brehm estimates that not going forward with the presidential primary would reduce the number of voters faced with an election by 1,488,715, and would result in "615 fewer poll sites opened for 15 hours of in-person voting," "22 fewer early voting sites opened for sixty hours of early voting spanning nine days," and "4,617 fewer poll workers needed." *Id.* ¶ 41. Brehm also explains that much of the work to prepare for the election "is not consistent with social distancing." *Id.* ¶ 44. And he estimates that holding the primary will cost the state approximately $5.6 million. *Id.* ¶ 51.

Protecting the public from the spread of COVID-19 is an important state interest. But the Court is not convinced that canceling the presidential primary would meaningfully advance that interest—at least not to the degree as would justify the burdensome impingement on Plaintiffs' and Plaintiff-Intervenors' rights. As Plaintiffs and Plaintiff-Intervenors point out, Governor Cuomo has already issued executive orders allowing every voter statewide to request an absentee ballot and providing absentee ballot request forms. Compl. ¶¶ 62–64. Even if not every voter can vote by mail—because they fail to request or do not receive an absentee ballot, because they need assistance voting, or because they are ineligible to cast an ordinary ballot but may cast a ballot with an affidavit, Brehm Decl. ¶ 54—there is no doubt that many voters will avail themselves of the opportunity to do so.[4]

This, in turn, will make it substantially easier for voters and poll workers to practice social distancing at voting sites. In 2016, a year in which two Democratic presidential primary

---

[4] As another measure to protect public safety, other local governments will allow ballots to be submitted via secure drop-off boxes. *See Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options*, National Conference of State Legislatures (Apr. 24, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx (noting the possibility of votes being submitted "at a secure drop box"); *see, e.g.*, Beau Evans, *Ballot Drop-Off Boxes Get Green Light for June 9 Primary in Georgia*, Online Athens (Apr. 15, 2020), https://www.onlineathens.com/news/20200415/ballot-drop-off-boxes-get-green-light-for-june-9-primary-in-georgia (reporting that "[c]ounty election officials in Georgia will have the option of installing drop-off boxes for absentee ballots in the June 9[, 2020] primary election under emergency rules the State Election Board adopted" in light of concerns over the safety of voters and poll workers).

candidates were actively competing for the nomination, approximately 1,970,000 voters cast

ballots.  *See Democratic Presidential Primary Results*, Board of Elections (Dec. 8,

2016), https://www.elections.ny.gov/NYSBOE/elections/2016/Primary/DemocraticPresPrimary

Results.pdf.  This year, when many voters will doubtless choose to vote by mail because of the

COVID-19 pandemic, in-person turnout is likely to be dramatically lower, allowing the state to

safely accommodate those voters who need to vote at a polling location.

   Moreover, in large portions of the state, including the most populous counties, elections

besides the presidential primary are scheduled for June 23.  *See* Compl. ¶¶ 71–72.  Primaries are

still taking place in 42 out of 62 counties in New York, including in Kings, Queens, New York,

Suffolk, Bronx, and Nassau Counties, each of which has a population exceeding one million.

ECF No. 32 at 29.  In those localities—whether the presidential primary goes forward or not—it

will be necessary to take the protective measures Defendants describe.  It is not clear that, in

those areas, resources will be conserved by eliminating the presidential primary from the ballot.

Moreover, the Court notes that June 23 is still seven weeks away.  The state, therefore, has

sufficient time to take necessary steps to protect voters.

   Finally, though all states are impacted by the current public health crisis, and some have

rescheduled their presidential primary elections in light of COVID-19, New York is the only one

to have canceled its primary, casting further doubt on Defendants' contention that scrapping the

primary is necessary to combat the risk posed by the virus.  *See* Def. Opp. at 17–18; *see also*

Nick Corasaniti and Stephanie Saul, *15 States Have Postponed Primaries During the Pandemic.*

*One Has Canceled*, The New York Times (April 27, 2020),

https://www.nytimes.com/article/2020-campaign-primary-calendar-coronavirus.html.

   In sum, removing Yang, Sanders, and other candidates from the Democratic primary

ballot will protect the public from COVID-19 only to a limited extent. But barring Plaintiffs and Plaintiff-Intervenors from participating in an election for party delegates will sharply curtail their associational rights.

Accordingly, the Court concludes that Plaintiffs and Plaintiff-Intervenors have made a clear and substantial showing of likelihood of success on the merits of their claim that the Democratic Commissioners' April 27 Resolution eliminating presidential candidates who suspended their campaigns or announced that they were no longer seeking the presidency, and the consequent cancellation of the presidential primary election, violated their First and Fourteenth Amendment rights.

### 3.   Balance of Equities and Public Interest

The equities tip strongly in Plaintiffs' and Plaintiff-Intervenors' favor for the reasons already discussed. In assessing the balance of equities, "the court must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction.'" *Make the Rd. New York v. Cuccinelli*, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019) (quoting *Winter*, 555 U.S. at 24).

Plaintiffs' and Plaintiff-Intervenors' injuries arising from the adoption of the April 27 Resolution and cancellation of the presidential primary are substantial. If all but one of the presidential candidates are removed from the ballot and the primary is not held, Delegate Plaintiffs will be deprived of the opportunity to compete for delegate slots and shape the course of events at the Convention, and voters will lose the chance to express their support for delegates who share their views. The loss of these First Amendment rights is a heavy hardship. *See New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (holding that denial of

First Amendment expressive rights constitutes "significant" hardship); *Billington v. Hayduk*, 439 F. Supp. 971, 974 (S.D.N.Y. 1977) ('[T]he hardship to plaintiff in not being considered . . . as a candidate in the upcoming election in possible violation of his rights far outweighs any inconvenience that defendants might suffer in having to include plaintiff's name on the ballot.").

The costs to Defendants of granting the requested relief are also significant.  Defendants estimate that conducting the presidential primary will require 615 additional poll sites, 22 additional early voting sites, 4,617 additional poll workers, and will cost the state approximately $5.6 million.  Brehm Decl. ¶¶ 41, 51.  The state undertook to bear those costs, however, when it assumed the responsibility of regulating and holding the primary election, and the state was presumably prepared to shoulder them before the adoption of the April 27 Resolution last week.  And though Defendants may incur additional costs if they take protective measures consistent with public safety, the scope of those added expenses is unclear—whereas Plaintiffs' and Plaintiff-Intervenors' loss is concrete and immediate.

There is also a strong public interest in permitting the presidential primary to proceed with the full roster of qualified candidates.  "[S]ecuring First Amendment rights is in the public interest."  *New York Progress & Prot. PAC,* 733 F.3d at 488.  Specifically, the public has an interest in being presented with several viable options in an election.  *See Hirschfeld v. Bd. of Elections in N.Y.C*, 984 F.2d 35, 39 (2d Cir. 1993) ("[T]he public's interest in having [plaintiff] as an additional choice on the ballot clearly outweighed any interest the [BOE] may have had in removing [plaintiff's] name two business days before the [g]eneral [e]lection.").  Moreover, because "the conduct of elections is so essential to a state's political self-determination," there is a "strong public interest in having elections go forward."  *Flores v. Town of Islip*, 382 F. Supp. 3d 197, 245 (E.D.N.Y. 2019) (citations omitted).  Courts frequently rely on this principle to

avoid issuing injunctions that would postpone or disrupt an election. *See, e.g.*, *Silberberg v. Bd. of Elections of the State of New York*, 216 F. Supp. 3d 411, 420–21 (S.D.N.Y. 2016); *Flores*, 382 F. Supp. 3d at 245. But the same rule also counsels against allowing a state to refuse to conduct a consequential race when it is possible for it to safely go forward. Of course, even faced with such serious concerns, "federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). The primary, however, is still almost two months away, giving Defendants and the public enough time to respond appropriately to this order, and for the election to proceed in a safe manner. *See also New York Progress & Prot. PAC*, 733 F.3d at 489 (holding that injunction allowing political action committee to solicit donations in excess of $150,000 was not untimely, though sought only 41 days before date of election).

Plaintiffs and Plaintiff-Intervenors have made a strong showing of irreparable harm without emergency relief, established a clear and substantial likelihood of success on the merits of their First and Fourteenth Amendment claims, and demonstrated that the balance of equities tips decisively in their favor and that the public interest would be served by such relief.

Accordingly, the Court holds that Plaintiffs and Plaintiff-Intervenors have established their entitlement to a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure.

IV.   Scope of Relief

The Court grants the preliminary injunction "to restore the status quo ante." *United States v. Adler's Creamery*, 107 F.2d 987, 990 (2d Cir. 1939). "The purpose of an injunction [pending litigation] is to guard against a change in conditions which will hamper or prevent the granting of such relief as may be found proper after the trial of the issues. Its ordinary function

is to preserve the status quo and it is to be issued only upon a showing that there would otherwise be danger of irreparable injury." *Id.*; *see also Asa v. Pictometry Intern. Corp.*, 757 F. Supp. 2d 238, 243 (W.D.N.Y.2010) ("[T]he court's task when granting a preliminary injunction is generally to restore, and preserve, the status quo ante, *i.e.*, the situation that existed between the parties immediately prior to the events that precipitated the dispute.").

Here, the status quo ante is the state of affairs immediately prior to the April 27 Resolution. "'Status quo' does not mean the situation existing at the moment the [lawsuit] is filed, but the 'last peaceable uncontested status existing between the parties before the dispute developed.'" *Chobani, LLC v. Dannon Co., Inc.*, 157 F. Supp. 3d 190, 201 (N.D.N.Y. 2016) (citation omitted) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2948 (2d ed. 1995)).

Accordingly, the Court's injunction restores all ten presidential candidates named in the April 27 Resolution, and their respective slates of delegate candidates, to the New York Democratic presidential primary ballot, and requires that the primary election be held on June 23, 2020.[5]

---

[5] In the alternative, the Court having concluded that Plaintiffs and Plaintiff-Intervenors have made a "clear" and "substantial" showing of likelihood of success on the merits, *Beal v. Stern*, 184 F.3d 117, 123 (2d Cir. 1999), a "strong showing" of irreparable harm, *Doe v. New York Univ.*, 666 F.2d 761, 773 (2d Cir. 1981), demonstrated that injunctive relief is in the public interest, *Actavis*, 787 F.3d at 650, and shown that the balance of equities tips in their favor, *Winter*, 555 U.S. at 24, the foregoing relief can also be granted as a mandatory injunction. Plaintiffs and Plaintiff-Intervenors style their request for relief as on behalf of themselves and "all others similarly situated." *See* Compl. at 1; Intervenor Compl. at 1. The others similarly situated are the putative delegates pledged to the other presidential candidates removed by the April 27 Resolution, as well as registered New York Democratic Party voters. The Court need not formally certify a class in order to issue the requested preliminary relief. *See, e.g.*, Newberg on Class Actions § 24:83 (4th ed. 2002) ("The absence of formal certification is no barrier to classwide preliminary injunctive relief."); Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed. 1990) ("Prior to the Court's determination whether plaintiffs can maintain a class action, the Court should treat the action as a class suit.").

29

## CONCLUSION

For the reasons stated in this opinion, the preliminary injunction is GRANTED to the extent that Kellner, Spano, Kosinski, Valentine, and Brehm, in their official capacities, are ORDERED to reinstate to the Democratic primary ballot those presidential and delegate candidates who were duly qualified as of April 26, 2020, and to hold the primary election on June 23, 2020.

The Clerk of Court is directed to terminate the motions at ECF Nos. 12, 30, and 31.

SO ORDERED.

Dated:  May 5, 2020
        New York, New York

_____
        ANALISA TORRES
     United States District Judge